## HAMILTON COUNTY
## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| **NATHANIEL GURTON** | : | **Case No.** |
| 1389 Galbraith Rd., #18 | : | |
| Cincinnati, OH 45231 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | **COMPLAINT WITH JURY DEMAND** |
| | : | |
| **CIAN MCGRATH** | : | |
| (P72/District 1) | : | |
| Cincinnati Police Department | : | |
| 310 Ezzard Charles Dr. | : | |
| Cincinnati, OH 45214 | : | |
| | : | |
| and | : | |
| | : | |
| **CITY OF CINCINNATI** | : | |
| PLEASE SERVE: SOLICITOR | : | |
| 801 Plum Street | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| Defendants. | : | |

Comes now the Plaintiff, Nathaniel Gurton ("Gurton"), and for his complaint state as follows:

### I. Nature of the Action

This is an action arising under 42 U.S.C. § 1983, the Constitution of the United States, and other state and federal law alleging that the City of Cincinnati, by and through its Police Officers and Administrators and acting under color of state law and in the course of their official duties, violated Gurton's rights under the Fourth Amendment to be free from excessive force, from the unreasonable seizure of his person, and to due process of law under the Fourteenth Amendment. More specifically, Gurton alleges that Officer McGrath used excessive force and

1

improperly arrested Gurton and asserted criminal charges against him without probable cause to do so, and that the City of Cincinnati, acting under color of state law, failed to effectively train, supervise, monitor, and discipline its police officers to prevent the use of excessive force and improper arrests by those officers.  In addition, Gurton raises claims under Ohio state law.

## II.  JURISDICTION AND VENUE

1.      Plaintiff Nathaniel Gurton seeks monetary damages against the Defendants on the grounds that the circumstances of Gurton's arrest violated the United States Constitution.

2.      Venue is proper in Hamilton County, Ohio because the incidents giving rise to the causes of action alleged herein occurred within this County.

## III.  PARTIES

3.      Plaintiff Nathaniel Gurton is a natural person who resides at 1389 Galbraith Avenue, #18, Cincinnati, Ohio 45231.

4.      Defendant City of Cincinnati ("City") is a political subdivision existing pursuant to the laws of the State of Ohio, and having the capacity and authority to sue and be sued in its own name.  The City of Cincinnati at all times relevant to this complaint employed, controlled, or had the right to control Police Officer Cian McGrath ("McGrath"), who committed the acts and conduct complained herein while acting in the course and scope of his employment for the City.

5.      Defendant Cian McGrath is a natural person who at all times relevant to this complaint was a police officer employed by the City of Cincinnati.

## IV.  COLOR OF LAW

6.      Plaintiff is informed, believes, and alleges that, at all times relevant to this action, Defendants City and McGrath acted in their official and governmental capacities and under color

2

of state and local law, and all of the acts alleged herein were done within the course and scope of their office, employment, and agency.

## V. FACTS

7.      On January 26, 2022 at approximately 8:00 a.m., Nathaniel Gurton was asleep in his bed. Nathanial Gurton resided at that time with his mother, father and siblings, including his eight year old brother, in an apartment in the Mt. Healthy neighborhood of Cincinnati.

8.      The Gurton family apartment is located in an apartment complex which is comprised of four separate buildings. Each building is two stories high, and contains four units. The Gurton family apartment is an end unit, so it has exposed windows on three sides, a front door, and a back door. The Gurton family apartment is immediately adjacent to a parking lot, but set back from Galbraith Rd. behind another building in the complex.

9.      At approximately 8:16 a.m., a group of at least five (5) Cincinnati Police Officers approached the Gurton family apartment. The officers wore body armor, and some wore helmets, masks, goggles, or glasses concealing their faces. All of them were heavily armed. Some carried handguns, while others carried assault rifles, and others also carried clubs, batons, and shields.

10.      At least some of the CPD officers wore body cameras that recorded the incidents.

11.      The CPD officers present that day included Defendant McGrath, P.O. Asbury, P.O. Jackson, P.O. Knapp, and P.O. Traufler, among others.

12.      The CPD Officers had arrived that morning with a warrant for the arrest of Nathaniel Gurton's father, Allen Gurton.

13.      The CPD Officers arrived in several vehicles. The Officers were dressed in plain clothes. The Officers fanned out around the Gurton family apartment.

3

14. Several of the Officers moved to the rear of the apartment and others went to the side, each of them positioning themselves near doors and windows.

15. With officers in position all around the apartment, McGrath began knocking on the front door. Shortly after he began knocking, from inside a voice responded: "who is it?"

16. Defendant McGrath yelled back, stating that it was the Police. Defendant McGrath addressed the person behind the door as "Allen." However, it cannot be discerned who was speaking from behind the door.

17. Defendant McGrath did not advise the person behind the door that the officers had any search warrant or arrest warrant, nor did he advise that they were seeking Allen Gurton. Rather, the CPD Officers simply commanded the unknown person behind the door to open the door and also threatened that the officers would kick in the door if the residents did not open it voluntarily.

18. Once the Officers at the front of the apartment had initiated the raid, the Officers at the rear and side attempted to force entry through other doors and windows. The Officer at the rear of the premises tried the rear door and attempted to kick it in, but found it locked.

19. P.O. Knapp wore a body camera which recorded the attempt to enter the rear door.

20. An Officer covering a side window had better luck. P.O. Asbury pried open the window with a bar. He opened it, reached in, and tore apart the plastic blinds that hung inside the window. Asbury then pulled the fabric drapes outside of the window. He thrust his handgun through the window into the living area of the apartment. He shouted, lacing his commands with profanity, ordering any occupants to go to the door, and threatened to release a dog into the apartment. Asbury did not notify anyone inside that the officers had an arrest warrant, nor did he

4

inform them who the officers were seeking. Less than two minutes had passed since McGrath had first knocked at the front door.

21. Having reached through the window and pointed his handgun into the living area, Asbury's hand became entangled in the blinds. He had to pause to unwind his gun from the draw string of the blinds.

22. P.O. Asbury and P.O. Knapp wore body cameras which recorded the entry and confrontation at the window.

23. Just moments after having been woken from their sleep, Nathaniel Gurton and his brother were now standing in their living room looking down the barrel of a gun which protruded through their window. Their eight year old brother was still in bed upstairs. Faced with the threat of a gun and a vicious dog, the Gurton brothers moved slowly toward the front door as commanded.

24. When Nathaniel Gurton's brother put his hand on the doorknob and began to open it as instructed by the officer, McGrath kicked the door in, striking Gurton's brother's hand.

25. When the door flew open under McGrath's forceful kick, the Gurton brothers found themselves facing three large figures in masks, helmets, and goggles, holding shields, clubs, and firearms. McGrath pointed his handgun directly at them, into the apartment.

26. McGrath and the other officers immediately began screaming and cursing at the two as they stood there startled. Still, none of the officers informed the Gurton family that they were in possession of a warrant or why they were there.

27. With their hands in the air, dressed in their pajamas, Nathaniel Gurton and his brother did precisely as commanded. They walked slowly through the front door one by one.

5

28. Nathaniel Gurton's brother exited first. As he exited, he was seized by another officer and handcuffed.

29. As Nathaniel Gurton walked through the front door, Defendant McGrath grabbed him by the shirt. When McGrath grabbed him, Nathaniel Gurton asked "What did I do?"

30. McGrath began to scream and curse at Nathaniel Gurton and immediately overpowered him. McGrath threw Nathaniel Gurton to the ground and pounded Gurton's face and head with the shield that McGrath still wielded. McGrath forced Nathaniel Gurton's face into the ground.

31. Gurton cried out in terror and confusion.

32. None of the Police Officers had yet announced that they had a warrant, nor provided any indication as to why they were there.

33. After he had been thrown to the ground, beaten in the head, and handcuffed, Nathaniel Gurton asked why he was being arrested. None of the Officers gave him any response.

34. After having detained Nathaniel Gurton and his brother, several other Officers entered the Gurton family apartment with guns drawn (including at least one assault rifle), and then arrested Allen Gurton.

35. Nathaniel Gurton was left in the cold on the front walk of the apartment, handcuffed and sitting on the ground. As he sat there, blood dripped from wounds on either side of his head around his ears and onto his face.

36. P.O. McGrath and P.O. Jackson wore body cameras which recorded the approach at the front door and the assault on Nathaniel Gurton.

37. As he sat there handcuffed, Gurton requested to speak with a supervisor in order to find out why he had been awoken, assaulted, and siezed by CPD officers.

6

38.     One of the officers noticed that Nathaniel Gurton was bleeding from both sides of his head, and therefore took photos of Gurton's face from both sides.

39.     As the minutes passed and Gurton received no satisfactory answers, he continued to complain about the mistreatment that he had suffered and requested to see a supervisor.

40.     Only then, several minutes later did McGrath inform Nathaniel Gurton that he was under arrest and charged with obstructing official business. McGrath claimed that Nathaniel Gurton had failed to follow police orders.  As of that moment, the CPD officers had still not advised Nathaniel Gurton and his brother that they had a warrant for their father's arrest.

41.     The CPD Officers eventually transported Nathaniel Gurton to a Cincinnati Police car where he was held to await medical treatment for the blood that continued to stream down both sides of his head.

42.     After several minutes, the Cincinnati Fire Department paramedics examined Gurton but were unable to meaningfully treat his wounds.  Although they placed bandages in his hair, they were unable to stop the flow of blood.

43.     The CPD officers on the scene laughed as the paramedics described the treatment that they had administered.

44.     When Gurton was later photographed by the Hamilton County Sheriff at the jail, the photographs depict the blood still streaming down his face.

45.     Nathaniel Gurton had advised the arresting officers that he was employed, and that he was scheduled to work later that morning.  The arresting Officers advised Nathaniel Gurton that he would be taken to jail and he would have to face arraignment and pay a bond.

46.     The arresting Officers took Gurton to jail where he was booked and processed.

7

47.     As a result of his failure to show up for work that day, Gurton was fired from his job.

48.     The Cincinnati Police Officers had sought the arrest of Allen Gurton on a charge of robbery.  However, when the Hamilton County prosecutor brought the charge before the grand jury, the charge was ignored.  Thus, the grand jury found that the State was unable to prove probable cause that Allen Gurton had committed the crime that had led to his arrest, the invasion of his home, and the beating and arrest of Nathaniel Gurton.

49.     Gurton procured legal counsel in order to defend the charge of obstruction of official business, despite the fact that the underlying charge against his father had failed to yield an indictment.

50.     An attorney from the Hamilton County Public Defender sought discovery and prepared the case for trial to a jury.

51.     On the trial date, McGrath and all the other CPD officers failed to appear for trial. McGrath had not advised the prosecuting attorney in advance, nor had he sought a continuance. The charge of obstructing official business against Nathaniel Gurton was dismissed for want of prosecution.

**COUNT I**
**42 U.S.C § 1983**

52.     Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

53.     Defendants City and McGrath falsely and without probable cause arrested Nathaniel Gurton or caused him to be arrested.  Nathaniel Gurton was within his rights as he stood within his own home and Nathaniel Gurton complied with the CPD officers' orders.

8

Nathaniel Gurton did not obstruct any official business and Defendant McGrath was without cause to arrest him. Nathaniel Gurton's arrest denied him the right to freedom from unreasonable search and seizure that is secured by the Fourth Amendment to the Constitution and laws of the United States and the State of Ohio.

54. Defendant McGrath employed excessive force in the false arrest of Nathaniel Gurton. Nathaniel Gurton did not obstruct official business necessitating the use of force and did not pose a threat to those around him. The excessive force used against Nathaniel Gurton denied him the right to freedom from the use of excessive force as guaranteed by the Fourth Amendment to the Constitution and law of the United States, and the Constitution and laws of the State of Ohio.

55. Defendants' arrest of Nathaniel Gurton was in violation of his right to due process under the Fifth and Fourteenth Amendment to the Constitution and laws of the United States, and the Constitution and laws of the State of Ohio.

56. The actions of Defendant McGrath were undertaken within the scope of his employment. At all times material to this action, the City, through its supervising and policy-making officials, supervised, authorized, and ratified the wrongful acts of the individual officers.

57. Defendant McGrath's use of physical force in restraining Nathaniel Gurton was without privilege, unreasonable, and unconstitutional, particularly given the lack of severity of the alleged crime.

58. Plaintiff Nathaniel Gurton has been damaged by Defendants' violation of his rights, including, without limitation, physical injuries during his arrest, emotional distress and trauma, lost income, and the expenses of legal defense to the improper, groundless and warrantless charges against him.

9

## COUNT II
## 42 U.S.C § 1983
## MALICIOUS PROSECUTION/ABUSE OF PROCESS

59.     Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

60.     Criminal prosecutions were initiated against Nathaniel Gurton precipitated by Defendant McGrath's false and inaccurate description of the facts and circumstances leading to Nathaniel Gurton's arrest.  The charges brought against Nathaniel Gurton were without probable cause and the result of false statements by Defendant McGrath.  As a consequence of these proceedings, Nathaniel Gurton suffered deprivations of his liberty including the original seizure of his person, and the restraint on his liberty incident to the criminal proceedings.

61.     The criminal proceedings resolved in Nathaniel Gurton's favor.

62.     The actions of the City and McGrath violated Nathaniel Gurton's rights under the Fourth and Fourteenth Amendments to the Constitution and laws of the United States.

63.     The denial of Nathaniel Gurton's Constitutional right to freedom from malicious prosecution and abuse of process has caused him monetary damages.

## COUNT III
## FAILURE TO TRAIN, SUPERVISE, MONITOR, AND DISCIPLINE/*MONELL*

64.     Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

65.     Defendant City inadequately trained, supervised, monitored, and disciplined its police officers on the proper use of force during arrest.  By their failure to train, supervise, monitor, and discipline the officers involved in this case, the City established a policy or custom which permits officers to use excessive force and to make improper arrests.  As such, the

E-FILED 01/23/2023 4:49 PM / CONFIRMATION 1276428 / A 2300319 / COMMON PLEAS DIVISION / IFIJ

inaction of the City of Cincinnati was the moving force behind Defendant McGrath's use of excessive force and improper arrest of Nathaniel Gurton.

66.     The City's failure to train, supervise, monitor, and discipline its officers, schools, and administrators resulted in the denial of Nathaniel Gurton's Constitutional rights which have caused him monetary damages.

## COUNT IV
## STATE LAW MALICIOUS PROSECUTION/ABUSE OF PROCESS

67.     Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

68.     Criminal prosecutions were initiated against Nathaniel Gurton precipitated by Defendant McGrath's false and inaccurate description of the facts and circumstances leading to Nathaniel Gurton's arrest.  As a consequence of these proceedings, Nathaniel Gurton suffered deprivations of his liberty including the original seizure of his person, and including but not limited to the restraint on his liberty incident to the criminal proceedings.

69      The criminal proceedings resolved in Nathaniel Gurton's favor.

70.     The actions of the City and McGrath violated Nathaniel Gurton's rights under the Constitution and laws of the State of Ohio.

71.     The denial of Nathaniel Gurton's Constitutional right to freedom from malicious prosecution and abuse of process has caused him monetary damages.

## COUNT V
## BATTERY
72.     Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

11

73.     Defendant McGrath acted intentionally and without privilege during the course of his unlawful arrest of Nathaniel Gurton to cause offensive physical contact with Nathaniel Gurton, and said physical contact did in fact occur.

74.     Plaintiff Nathaniel Gurton was damaged as a result of Defendant McGrath's conduct, including without limitation, physical injuries during his arrest, emotional distress and trauma.

## COUNT VI
## FALSE IMPRISONMENT

75.     Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

76.     Defendant McGrath unlawfully restrained Plaintiff Nathaniel Gurton.

77.     Defendant's unlawful restraint of Nathaniel Gurton was without Nathaniel Gurton Gurton's consent.

78.     Defendants' unlawful detention of Nathaniel Gurton was without probable cause, and was without privilege.

79.     Plaintiff Nathaniel Gurton has been damaged by Defendants unlawful restraint.

## COUNT VII:
## 42 U.S.C. § 1983/INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS

80.     Plaintiff realleges each of the foregoing paragraphs as if fully rewritten here.

81.     Defendant McGrath intentionally inflicted emotional distress on Plaintiff Nathaniel Gurton.

82.     Defendant McGrath intended to cause emotional distress and knew or should have

12

known that his actions would result in serious emotional distress to Nathaniel Gurton.

83.     Defendant McGrath's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community.

84.     Defendant McGrath's actions were the proximate cause of Nathaniel Gurton's psychological injuries.

85.     The mental anguish suffered by Nathaniel Gurton is serious and of a nature that no reasonable person could be expected to endure it.

86.     Plaintiff is therefore entitled to an award of actual and punitive damages from Defendant McGrath.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Nathaniel Gurton prays that the Court grant the following relief:

1.     Compensatory damages in excess of $25,000.00 arising from Defendants actions and the denial of Plaintiff's rights, including without limitation the costs, expenses, and lost income or opportunities incurred in mounting his defense to the false charges brought against him, as well as for pain, suffering, and other losses;

2.     Punitive damages as may be authorized by law;

3.     For an award of his reasonable attorney's fees and costs pursuant to the Civil Rights Attorneys Fees Award Act of 1976, 42 U.S.C. § 1988;

4.     For an award of the taxable costs of court; and

5.     For such other and further relief as the Court may deem appropriate.

E-FILED 01/23/2023 4:49 PM / CONFIRMATION 1276428 / A 2300319 / COMMON PLEAS DIVISION / IFIJ

Respectfully submitted,

/s/ J. Robert Linneman
J. Robert Linneman (0073846)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, OH  45202
(513) 721-4450
*Attorney for Plaintiff*
*Nathaniel Gurton*

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

/s/ J. Robert Linneman

693275.5

14