# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **NATHANIEL GURTON** | : | Case No. 1:23-cv-65 |
| 1389 Galbraith Rd., #18 | : | |
| Cincinnati, OH 45231 | : | **Judge: Jeffery P. Hopkins** |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | **PLAINTIFF'S FIRST AMENDED** |
| | : | **COMPLAINT WITH JURY DEMAND** |
| **CIAN MCGRATH** | : | |
| (P72/District 1) | : | |
| Cincinnati Police Department | : | |
| 310 Ezzard Charles Dr. | : | |
| Cincinnati, OH 45214 | : | |
| | : | |
| and | : | |
| | : | |
| **NATHAN ASBURY** | : | |
| (P72/District 1) | : | |
| Cincinnati Police Department | : | |
| 310 Ezzard Charles Dr. | : | |
| Cincinnati, OH 45214 | : | |
| | : | |
| and | : | |
| | : | |
| **JASON VOELKERDING** | : | |
| Department of Public Safety | : | |
| University of Cincinnati | : | |
| 51 West Corry Blvd. | : | |
| Cincinnati, OH 45221 | : | |
| | : | |
| and | : | |
| | : | |
| **STEPHEN SAUNDERS** | : | |
| Cincinnati Police Department | : | |
| 310 Ezzard Charles Dr. | : | |
| Cincinnati, OH 45214 | : | |
| | : | |
| and | : | |
| | : | |
| **LISA DAVIS** | : | |
| Cincinnati Police Department | : | |
| 310 Ezzard Charles Dr. | : | |

| | |
|---|---|
| Cincinnati, OH 45214 | : |
| | : |
| and | : |
| | : |
| **ELIOT ISAAC** | : |
| Department of Public Safety | : |
| University of Cincinnati | : |
| 51 West Corry Blvd. | : |
| Cincinnati, OH 45221 | : |
| | : |
| and | : |
| | : |
| **CITY OF CINCINNATI** | : |
| PLEASE SERVE: SOLICITOR | : |
| 801 Plum Street | : |
| Cincinnati, OH 45202 | : |
| | : |
| Defendants. | : |

Comes now the Plaintiff, Nathaniel Gurton ("Gurton"), and for his First Amended Complaint and state as follows:

### I. Nature of the Action

This is an action arising under 42 U.S.C. § 1983, the Constitution of the United States, and other state and federal law alleging that the City of Cincinnati, by and through its Police Officers and Administrators and acting under color of state law and in the course of their official duties, violated Gurton's rights under the Fourth Amendment to be free from excessive force, from the unreasonable seizure of his person, and to due process of law under the Fourteenth Amendment. More specifically, Gurton alleges that Officer McGrath used excessive force and improperly arrested Gurton and asserted criminal charges against him without probable cause to do so, and that the City of Cincinnati, acting under color of state law, failed to effectively train, supervise, monitor, and discipline its police officers to prevent the use of excessive force and improper arrests by those officers. In addition, Gurton raises claims under Ohio state law.

2

## II. JURISDICTION AND VENUE

1. Plaintiff Nathaniel Gurton seeks monetary damages against the Defendants on the grounds that the circumstances of Gurton's arrest violated the United States Constitution.

2. The Defendants have invoked the jurisdiction of this Court by virtue of their removal of the case from the Court of Common Pleas of Hamilton County, Ohio.

3. Subject matter jurisdiction over the instant case is conferred under 28 U.S.C. 1331 and 1343(3) and (4). This Court has pendant jurisdiction over Plaintiff's state law claims.

4. Venue is proper in this Court because the incidents giving rise to the causes of action alleged herein occurred within this District.

## III. PARTIES

5. Plaintiff Nathaniel Gurton is a natural person who resides at 1389 Galbraith Avenue, #18, Cincinnati, Ohio 45231.

6. Defendant Cian McGrath is a natural person who at all times relevant to this complaint was a police officer employed by the City of Cincinnati. He is being sued individually and in his official capacity.

7. Defendant Sergeant Nathan Asbury is a natural person who at all times relevant to this complaint was a ranking police officer employed by the City of Cincinnati, exercising supervisory control over Defendant Cian McGrath. He is being sued individually and in his official capacity.

8. Defendant Lieutenant Jason Voelkerding is a natural person who at all times relevant to this complaint was a ranking police officer employed by the City of Cincinnati,

3

exercising supervisory control over Defendants Cian McGrath and Nathan Asbury. He is being sued individually and in his official capacity.

9. Defendant Captain Stephen Saunders is a natural person who at all times relevant to this complaint was a ranking police officer employed by the City of Cincinnati, exercising supervisory control over Defendants Cian McGrath, Nathan Asbury, and Jason Voelkerding. He is being sued individually and in his official capacity.

10. Defendant Lieutenant Colonel Lisa Davis is a natural person who at all times relevant to this complaint was a ranking police officer employed by the City of Cincinnati, exercising supervisory control over Defendants Cian McGrath, Nathan Asbury, Jason Voelkerding, and Stephen Saunders. She is being sued individually and in his official capacity.

11. Defendant Colonel Eliot Isaac is a natural person who at all times relevant to this complaint was a ranking police officer employed by the City of Cincinnati, exercising supervisory control over Defendants Cian McGrath, Nathan Asbury, Jason Voelkerding, Stephen Saunders, and Lisa Davis. He is being sued individually and in his official capacity.

12. Defendants Asbury, Voelkerding, Saunders, Davis, and Isaac may be referred to herein collectively as "Supervisory Defendants."

13. Defendant City of Cincinnati ("City") is a political subdivision existing pursuant to the laws of the State of Ohio, and having the capacity and authority to sue and be sued in its own name. The City of Cincinnati at all times relevant to this complaint employed, controlled, or had the right to control Police Officer Cian McGrath ("McGrath"), who committed the acts and conduct complained herein while acting in the course and scope of his employment for the City. City exercised its control over McGrath through the actions of Supervisory Defendants.

4

## IV. COLOR OF LAW

14. Plaintiff is informed, believes, and alleges that, at all times relevant to this action, Defendants McGrath, Supervisory Defendants, and City acted in their official and governmental capacities and under color of state and local law, and all of the acts alleged herein were done within the course and scope of their office, employment, and agency.

## V. FACTS

15. On January 26, 2022, at approximately 8:00 A.M., Nathaniel Gurton was asleep in his bed. Nathanial Gurton resided at that time with his mother, father and siblings, including his eight year old brother, in an apartment in the Mt. Healthy neighborhood of Cincinnati.

16. The Gurton family apartment is located in an apartment complex which is comprised of four separate buildings. Each building is two stories high, and contains four units. The Gurton family apartment is an end unit, so it has exposed windows on three sides, a front door, and a back door. The Gurton family apartment is immediately adjacent to a parking lot, but set back from Galbraith Rd. behind another building in the complex.

17. At approximately 8:16 A.M., a group of at least five (5) Cincinnati Police Officers approached the Gurton family apartment. The officers wore body armor, and some wore helmets, masks, goggles, or glasses concealing their faces. All of them were heavily armed. Some carried handguns, while others carried assault rifles, and others also carried clubs, batons, and shields.

18. At least some of the CPD officers wore body cameras that recorded the incidents.

19. The CPD officers present that day included Defendant McGrath, Defendant Asbury, P.O. Jackson, P.O. Knapp, and P.O. Traufler, among others.

5

20. The CPD Officers had arrived that morning with a warrant for the arrest of Nathaniel Gurton's father, Allen Gurton.

21. The CPD Officers arrived in several vehicles. The Officers were dressed in plain clothes. The Officers fanned out around the Gurton family apartment.

22. Several of the Officers moved to the rear of the apartment and others went to the side, each of them positioning themselves near doors and windows.

23. With officers in position all around the apartment, McGrath began knocking on the front door. Shortly after he began knocking, from inside a voice responded: "who is it?"

24. Defendant McGrath yelled back, stating that it was the Police. Defendant McGrath addressed the person behind the door as "Allen." However, it cannot be discerned who was speaking from behind the door.

25. Defendant McGrath did not advise the person behind the door that the officers had any search warrant or arrest warrant, nor did he advise that they were seeking Allen Gurton. Rather, the CPD Officers simply commanded the unknown person behind the door to open the door and also threatened that the officers would kick in the door if the residents did not open it voluntarily.

26. Once the Officers at the front of the apartment had initiated the raid, the Officers at the rear and side attempted to force entry through other doors and windows. The Officer at the rear of the premises tried the rear door and attempted to kick it in, but found it locked.

27. P.O. Knapp wore a body camera which recorded the attempt to enter the rear door.

6

28. Defendant Asbury covering a side window had better luck. Defendant Asbury pried open the window with a bar. He opened it, reached in, and tore apart the plastic blinds that hung inside the window. Defendant Asbury then pulled the fabric drapes outside of the window. He thrust his handgun through the window into the living area of the apartment. He shouted, lacing his commands with profanity, ordering any occupants to go to and open the door, and threatened to release a dog into the apartment. Defendant Asbury did not notify anyone inside that the officers had an arrest warrant, nor did he inform them who the officers were seeking. Less than two minutes had passed since McGrath had first knocked at the front door.

29. Having reached through the window and pointed his handgun into the living area, Defendant Asbury's hand became entangled in the blinds. He had to pause to unwind his gun from the draw string of the blinds.

30. Defendant Asbury and P.O. Knapp wore body cameras which recorded the entry and confrontation at the window.

31. Just moments after having been woken from their sleep, Nathaniel Gurton and his brother were now standing in their living room looking down the barrel of a gun which protruded through their window. Their eight year old brother was still in bed upstairs. Faced with the threat of a gun and a vicious dog, the Gurton brothers moved slowly toward the front door as commanded.

32. When Nathaniel Gurton's brother put his hand on the doorknob and began to open it as instructed by the officer, McGrath kicked the door in, striking Gurton's brother's hand.

7

33. When the door flew open under McGrath's forceful kick, the Gurton brothers found themselves facing three large figures in masks, helmets, and goggles, holding shields, clubs, and firearms. McGrath pointed his handgun directly at them, into the apartment.

34. McGrath and the other officers immediately began screaming and cursing at the two as they stood there startled. Still, none of the officers informed the Gurton family that they were in possession of a warrant or why they were there.

35. With their hands in the air, dressed in their pajamas, Nathaniel Gurton and his brother did precisely as commanded. They walked slowly through the front door one by one.

36. Nathaniel Gurton's brother exited first. As he exited, he was seized by another officer and handcuffed.

37. As Nathaniel Gurton walked through the front door, Defendant McGrath grabbed him by the shirt. When McGrath grabbed him, Nathaniel Gurton asked "What did I do?"

38. McGrath began to scream and curse at Nathaniel Gurton and immediately overpowered him. McGrath threw Nathaniel Gurton to the ground and pounded Gurton's face and head with the shield that McGrath still wielded. McGrath forced Nathaniel Gurton's face into the ground.

39. Gurton cried out in terror and confusion.

40. None of the Police Officers had yet announced that they had a warrant, nor provided any indication as to why they were there.

41. After he had been thrown to the ground, beaten in the head, and handcuffed, Nathaniel Gurton asked why he was being arrested. None of the Officers gave him any response.

42. At no point did Defendant Asbury, the ranking officer and supervisor, make any statements or take any actions to indicate that Defendant McGrath's actions in striking and unlawfully detaining Gurton were inappropriate or failed to conform with Defendant City of Cincinnati's policies. Defendant Asbury ratified Defendant McGrath's actions by his approval and participation in the assault, battery, and arrest of Gurton.

43. After having detained Nathaniel Gurton and his brother, several other Officers entered the Gurton family apartment with guns drawn (including at least one assault rifle), and then arrested Allen Gurton.

44. Nathaniel Gurton was left in the cold on the front walk of the apartment, handcuffed and sitting on the ground. As he sat there, blood dripped from wounds on either side of his head around his ears and onto his face.

45. P.O. McGrath and P.O. Jackson wore body cameras which recorded the approach at the front door and the assault on Nathaniel Gurton.

46. As he sat there handcuffed, Gurton requested to speak with a supervisor in order to find out why he had been awoken, assaulted, and siezed by CPD officers.

47. One of the officers noticed that Nathaniel Gurton was bleeding from both sides of his head, and therefore took photos of Gurton's face from both sides.

48. Nathaniel Gurton was eventually assisted to a standing position by Defendant Asbury. Gurton, still in his bed clothes, stood shivering and bleeding in the January cold.

49. As the minutes passed and Gurton received no satisfactory answers, he continued to complain about the mistreatment that he had suffered and requested to see a supervisor.

9

50. Only then, several minutes later did McGrath inform Nathaniel Gurton that he was under arrest and charged with obstructing official business. McGrath claimed that Nathaniel Gurton had failed to follow police orders. As of that moment, the CPD officers had still not advised Nathaniel Gurton and his brother that they had a warrant for their father's arrest.

51. As he plead to the police officers to release him, Gurton heard a repeated refrain from the officers: "What's done is done."

52. The CPD Officers eventually transported Nathaniel Gurton to a Cincinnati Police car where he was held to await medical treatment for the blood that continued to stream down both sides of his head.

53. After several minutes, the Cincinnati Fire Department paramedics examined Gurton but were unable to meaningfully treat his wounds. Although they placed bandages in his hair, they were unable to stop the flow of blood.

54. Prior to treatment, Gurton asked to speak to a supervisor. Defendant Asbury responded, "That's me." Gurton explained that he had complied with McGrath. Why was he being detained? Defendant Asbury responded, "You should have followed orders." When Gurton protested that he had been grabbed, Defendant Asbury slammed the cruiser door in his face. Defendant Asbury later explained that he would be conducting an investigation into the assault.

55. The CPD officers on the scene laughed as the paramedics described the treatment that they had administered.

56. When Gurton was later photographed by the Hamilton County Sheriff at the jail, the photographs depict the blood still streaming down his face.

57. Nathaniel Gurton had advised the arresting officers that he was employed, and that he was scheduled to work later that morning. The arresting Officers advised Nathaniel Gurton that he would be taken to jail, and he would have to face arraignment and pay a bond.

58. The arresting Officers took Gurton to jail where he was booked and processed.

59. As a result of his failure to show up for work that day, Gurton was fired from his job.

60. The Cincinnati Police Officers had sought the arrest of Allen Gurton on a charge of robbery. However, when the Hamilton County prosecutor brought the charge before the grand jury, the charge was ignored. Thus, the grand jury found that the State was unable to prove probable cause that Allen Gurton had committed the crime that had led to his arrest, the invasion of his home, and the beating and arrest of Nathaniel Gurton.

61. Gurton procured legal counsel in order to defend the charge of obstruction of official business, despite the fact that the underlying charge against his father had failed to yield an indictment.

62. An attorney from the Hamilton County Public Defender sought discovery and prepared the case for trial to a jury.

63. On the trial date, McGrath and all the other CPD officers failed to appear for his trial. McGrath had not advised the prosecuting attorney in advance, nor had he sought a continuance. The charge of obstructing official business against Nathaniel Gurton was dismissed for want of prosecution.

64. Cincinnati Police Department Procedure Manual policy no. 12.815(C)(2)(a) addresses the circumstances for an officer to change court appearances on the same day as the

scheduled appearance. The circumstances must be "unforeseen" or "emergencies". McGrath's absence did not comply with this policy.

## COUNT I
## 42 U.S.C § 1983

65. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

66. Defendants City and McGrath falsely and without probable cause arrested Nathaniel Gurton or caused him to be arrested. Nathaniel Gurton was within his rights as he stood within his own home and Nathaniel Gurton complied with the CPD officers' orders. Nathaniel Gurton did not obstruct any official business and Defendant McGrath was without cause to arrest him. Nathaniel Gurton's arrest denied him the right to freedom from unreasonable search and seizure that is secured by the Fourth and Fourteenth Amendments to the Constitution and laws of the United States and the State of Ohio.

67. Defendant McGrath employed excessive force in the false arrest of Nathaniel Gurton. Nathaniel Gurton did not obstruct official business necessitating the use of force and did not pose a threat to those around him. The excessive force used against Nathaniel Gurton denied him the right to freedom from the use of excessive force as guaranteed by the Fourth Amendment to the Constitution and law of the United States, and the Constitution and laws of the State of Ohio.

68. Defendants' arrest of Nathaniel Gurton was in violation of his right to due process under the Fifth and Fourteenth Amendment to the Constitution and laws of the United States, and the Constitution and laws of the State of Ohio.

69. The actions of Defendant McGrath were undertaken within the scope of his employment. At all times material to this action, the City, through its supervising and policy-making officials, including the other Defendants, supervised, authorized, and ratified the wrongful acts of the individual officers.

70. Defendant McGrath's use of physical force in restraining Nathaniel Gurton was without privilege, unreasonable, and unconstitutional, particularly given the lack of severity of the alleged crime.

71. Plaintiff Nathaniel Gurton has been damaged by Defendants' violation of his rights, including, without limitation, physical injuries during his arrest, emotional distress and trauma, and lost income.

## COUNT II
## 42 U.S.C § 1983
## MALICIOUS PROSECUTION/ABUSE OF PROCESS

72. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

73. Criminal prosecutions were initiated against Nathaniel Gurton precipitated by Defendant McGrath's false and inaccurate description of the facts and circumstances leading to Nathaniel Gurton's arrest. The charges brought against Nathaniel Gurton were without probable cause and the result of false statements by Defendant McGrath. As a consequence of these proceedings, Nathaniel Gurton suffered deprivations of his liberty including the original seizure of his person, and the restraint on his liberty incident to the criminal proceedings.

74. The criminal proceedings resolved in Nathaniel Gurton's favor.

75. The actions of Defendants violated Nathaniel Gurton's rights under the Fourth and Fourteenth Amendments to the Constitution and laws of the United States.

76. The denial of Nathaniel Gurton's Constitutional right to freedom from malicious prosecution and abuse of process has caused him monetary damages.

77. Plaintiff Nathaniel Gurton has been damaged by Defendants' wrongful conduct, including, without limitation, physical injuries during his arrest, emotional distress and trauma, and lost income

## COUNT III
## FAILURE TO TRAIN, SUPERVISE, MONITOR, AND DISCIPLINE/*MONELL*

78. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

79. Defendant City, through its agents, Supervisory Defendants, inadequately trained, supervised, monitored, and disciplined its police officers on the proper use of force during arrests. By their failure to train, supervise, monitor, and discipline the officers involved in this case, the City and the Supervisory Defendants established a policy or custom which permits officers to use excessive force and to make improper arrests. As such, the inaction of the City of Cincinnati was the moving force behind Defendant McGrath's use of excessive force and improper arrest of Nathaniel Gurton.

80. Defendant City has a history of failing to adequately train, supervise, monitor, and discipline its officers, which has resulted in repeated violations of the Constitutional rights of citizens, including Plaintiff Nathaniel Gurton.

81. To the extent that the City does have formal policies which purport to provide basic protection of the Constitutional rights of its citizens, the City and the Supervisory

Defendants have engaged in a practice of acquiescence to violations of those policies by failing to adequately discipline its officers for violations, failing to supervise, train and monitor to prevent such violations.

82. The City's failure to adequately train, supervise, monitor, and discipline officers for violations of constitutional rights is widespread, longstanding, and well-settled, such that it constitutes a custom and usage with the effective force of law.

83. The City has policies for investigations into assaults on bystanders. However, when a bystander, like Plaintiff Nathaniel Gurton, invokes officers in positions of authority to investigate such an assault, no meaningful investigation occurs.

84. Among other policies, practices and customs, the Cincinnati Police Department implements a policy or custom of permitting officers to arrest private citizens without probable cause or legal justification.

85. Officers of the Cincinnati Police Department have established a practice of pursuing baseless criminal charges as a pretext to justify unlawful assaults, battery, and detention of individuals.

86. The Cincinnati Police Department's policies require officers to attend criminal trials in which the officer is a prosecuting witness. However, this policy is not enforced as evidenced by Defendant McGrath's failure to appear at Plaintiff Nathaniel Gurton's trial and similar failures to appear at trial by other Cincinnati Police Officers.

87. By its failure to properly train, supervise, monitor, and discipline its employees, Defendant City of Cincinnati, acting under color of law, deprived Nathaniel Gurton of his right to be free from excessive force and unlawful seizure, protected by the Fourth, Fifth, and

15

Fourteenth Amendments to the United States Constitution and Article 1, Sections 1 and 16 of the Constitution of the State of Ohio.

## COUNT IV
### STATE LAW MALICIOUS PROSECUTION/ABUSE OF PROCESS

88. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

89. Criminal prosecutions were initiated against Nathaniel Gurton precipitated by Defendant McGrath's false and inaccurate description of the facts and circumstances leading to Nathaniel Gurton's arrest. As a consequence of these proceedings, Nathaniel Gurton suffered deprivations of his liberty including the original seizure of his person, and including but not limited to the restraint on his liberty incident to the criminal proceedings.

90. The criminal proceedings resolved in Nathaniel Gurton's favor.

91. The actions of the City and McGrath violated Nathaniel Gurton's rights under the Constitution and laws of the State of Ohio.

92. The denial of Nathaniel Gurton's Constitutional right to freedom from malicious prosecution and abuse of process has caused him monetary damages.

93. Plaintiff Nathaniel Gurton has been damaged by Defendants' wrongful conduct, including, without limitation, physical injuries during his arrest, emotional distress and trauma, and lost income

## COUNT V
### BATTERY

94. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

16

95. Defendant McGrath acted intentionally and without privilege during the course of his unlawful arrest of Nathaniel Gurton to cause offensive physical contact with Nathaniel Gurton, and said physical contact did in fact occur.

96. Plaintiff Nathaniel Gurton was damaged as a result of Defendant McGrath's conduct, including without limitation, physical injuries during his arrest, emotional distress and trauma.

## COUNT VI
## FALSE IMPRISONMENT

97. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

98. Defendant McGrath unlawfully restrained Plaintiff Nathaniel Gurton.

99. Defendant's unlawful restraint of Nathaniel Gurton was without Nathaniel Gurton's consent.

100. Defendants' unlawful detention of Nathaniel Gurton was without probable cause and was without privilege.

101. Plaintiff Nathaniel Gurton has been damaged by Defendants' unlawful restraint.

## COUNT VII
## 42 U.S.C. § 1983/INTENTIONAL INFLICTION
## OF EMOTIONAL DISTRESS

102. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

103. Defendants McGrath intentionally inflicted emotional distress on Plaintiff Nathaniel Gurton.

104. Defendants McGrath intended to cause emotional distress and knew or should

have known that his actions would result in serious emotional distress to Nathaniel Gurton.

105. Defendant McGrath's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community.

106. Defendant McGrath's actions were the proximate cause of Nathaniel Gurton's psychological injuries.

107. The mental anguish suffered by Nathaniel Gurton is serious and of a nature that no reasonable person could be expected to endure it.

108. Plaintiff is therefore entitled to an award of actual and punitive damages from Defendants McGrath and Asbury.

## COUNT VIII
## SUPERVISORY LIABILITY

109. Plaintiff hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

110. Each of the Supervisory Defendants failed to adequately train, supervise, and discipline McGrath and its other officers in basic Fourth Amendment principles, execution of arrest warrants, and other principles and practices of policing.

111. Each of the Supervisory Defendants ratified McGrath's illegal conduct after the fact by explicit approval of his actions, or by their failure to undertake any meaningful investigation of the same.

112. By their failure to properly train, supervise, monitor, and discipline McGrath and its other officers, each of the Supervisory Defendants, acting under color of law, deprived Nathaniel Gurton of his right to be free from excessive force and unlawful seizure, protected by

18

the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Article 1, Sections 1 and 16 of the Constitution of the State of Ohio.

113. Gurton has been damaged by the actions of the Supervisory Defendants.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Nathaniel Gurton prays that the Court grant the following relief:

1. Compensatory damages in excess of $25,000.00 arising from Defendants actions and the denial of Plaintiff's rights, including without limitation the costs, expenses, and lost income or opportunities incurred in mounting his defense to the false charges brought against him, as well as for pain, suffering, and other losses;

2. Punitive damages as may be authorized by law;

3. For an award of his reasonable attorney's fees and costs pursuant to the Civil Rights Attorneys Fees Award Act of 1976, 42 U.S.C. § 1988;

4. For an award of the taxable costs of court; and

5. For such other and further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ J. Robert Linneman
J. Robert Linneman (0073846)
H. Louis Sirkin (0024573)
Mark A. Tassone (0099017)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, OH 45202
(513) 721-4450
*Attorney for Plaintiff*
*Nathaniel Gurton*

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

/s/ J. Robert Linneman

694533.3