## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **NATHANIEL GURTON,** | : | **Case No. 1:23cv65** |
| **Plaintiff,** | : | **Judge Jeffery P. Hopkins** |
| **v.** | : | **DEFENDANTS' MOTION** |
| | | **FOR SUMMARY JUDGMENT** |
| **CIAN McGRATH, et al.,** | : | |
| **Defendants.** | : | |

Upon the attached memorandum and all pleadings and filings herein, Defendants Cian McGrath, Nathan Asbury, Jason T. Voelkerding, Stephen Saunders, Lisa Davis, Eliot Isaac, and the City of Cincinnati (collectively "Defendants") move for an Order granting summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56(a). There are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.

## MEMORANDUM IN SUPPORT

### I. SUMMARY

Serving a felony arrest warrant at a home can be fraught with risk for all present. The knock-and-announce principle codified in Ohio law reflects the shared understanding that an arrest warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); R.C. 2935.12. When officers forcibly enter and issue lawful commands at gunpoint for a suspect's family members to raise their hands and move out of the way, that is not the time to refuse or to move at one's own pace, as was the case here.

The instant dispute arose out of a 21-year-old man's wrongheaded reaction to learning police officers were at the door seeking one of his family members. Plaintiff complains the officers

did not say the word "warrant" after announcing "Police" and calling for Plaintiff's father to come to the door. Plaintiff misapprehends the law. The Sixth Circuit adheres to the principle that, for Fourth Amendment purposes, "'the identification of themselves as police and giving the occupants *a reasonable time to respond* are far more constitutionally significant' than the requirement that officers state their purpose." *United States v. Dice*, 200 F.3d 978, 984 (6th Cir. 2000) (italics added), quoting *United States v. Finch*, 998 F.2d 349, 354 (6th Cir. 1993).

The officers here were met with over two minutes of silence as Plaintiff and his older brother stood near the front door deliberately ignoring the officers' repeated commands for their father to come to the door with his hands raised. The father eventually surrendered, expressing no confusion over why the police were there. Plaintiff, who is not joined by any of his family members in this Section 1983 action, fails to present a genuine issue of material fact for trial as to any of his claims, which allege excessive force, unlawful entry, malicious prosecution, and municipal liability. The Court should grant Defendants' motion for summary judgment.

## II. <u>STATEMENT OF FACTS</u>

Plaintiff Nathaniel Gurton ("Nathaniel") shared an apartment with his father, Allen Gurton, Sr. (Am. Compl., Doc. 16, PageID 150; Gurton Dep., Doc. 33-1, PageID 243-45). Nathaniel's father was wanted for robbery pursuant to a felony warrant issued in October 2021. (McGrath Dec., Doc. 38-1, ¶ 7, PageID 410; Doc. 38-2.) On the morning of January 26, 2022, officers assigned to the Cincinnati Police Department's ("CPD") Fugitive Apprehension Squad learned that Plaintiff's father was home and so, shortly after 8:00 a.m., they knocked on his front door. (Doc. 38-1, ¶¶ 10-11, PageID 411). They wore tactical vests marked "Police" and carried ballistic shields. (Id.).

Bodyworn camera ("BWC") video shows an officer knocking, getting a response, and

replying "Police."[1] (Id.). It was Nathaniel who responded, asking "Who is it?" from his bedroom window over the front door. (Gurton Dep., Doc. 33-1, PageID 265). Nathaniel heard the officers' response and knew the police were there. (Id.)

Nathaniel then went completely incommunicado. After waiting a few seconds for a response, the officers knocked again, announced "Police" again, and stated that they were there for "Allen." (McGrath Dec., Doc. 38-1, ¶ 11, PageID 411). There was no response. (Id.). The officers continued to knock, announcing "Police," that they were there for "Allen," and that "Allen" needed to come to the door. (McGrath Dec., Doc. 38-1, ¶ 12, PageID 411). Over two minutes went by, more than enough time for any of the occupants of the Gurton home to retrieve a weapon, prepare to flee, hide, or position themselves to fight. (Id., ¶ 13, PageID 411-12). The officers' prior investigation had indicated that more than one person at the Gurton home had a history of weapons charges and violent offenses. (Id., ¶ 7, PageID 410). Despite Nathaniel knowing the police were there for one of his family members, *neither he nor anyone* responded to the police calling for "Allen" to come to the door.

During that two-minute span, Nathaniel and his older brother, Allen Gurton, Jr. ("Allen Jr."), stood near the front door ignoring the officers' commands to come to the door and show their hands. (Asbury Dec., Doc. 39-1, ¶¶ 7-8, PageID 431-32; Gurton Dep., Doc. 33-1, PageID 267-68, 311-13). Neither of them asked the officers anything—not "Which Allen?" or "What do you want?," or "He's asleep" or "He's coming"—nothing to indicate a willingness to communicate with the officers who were making it clear that they would not leave unless Allen came to the door.

---

[1] The BWC video files have been filed manually pursuant to the Order (Doc. 34) granting leave to file the unredacted files under seal. (Notices of Manual Filing, Docs. 36, 37). For the convenience of the Court and counsel, the Notices of Manual Filing contain hyperlinks allowing viewers using authorized email addresses to access the files online. The McGrath and Asbury Declarations filed in support of this summary judgment motion contain photos generated from those files. (Docs. 38-1, 39-1).

(McGrath Dec., 38-1, ¶¶ 13-14, PageID 411-12; Asbury Dec., 39-1, ¶ 11, PageID 433-34). As the three-minute mark approached, Sergeant Nathan Asbury, positioned at the side window, raised the window and heard a voice inside saying "Don't let them in." (39-1, ¶ 9, PageID 432-433). Sergeant Asbury commanded Nathaniel and Allen, Jr. at gunpoint to open the door. (Id.)

Following Sergeant Asbury's commands, Allen Jr. opened the door, showed his hands, and exited the home. (McGrath Dec., Doc. 38-1, ¶ 20, PageID 414). The officers detained Allen Jr. at the scene long enough to take Allen Gurton, Sr., who was still inside the apartment, into custody. (Id., ¶¶ 20, 30, PageID 414, 420). At that point they released Allen Jr. and did not charge him with any offense. (Id.)

Nathaniel, on the other hand, standing behind his brother, failed to show his hands as ordered. (Id., ¶¶ 21-24 PageID 415-17). He clenched an object in his right hand and stood blocking Officer McGrath's view of what was behind Nathaniel. (Id., ¶¶ 22, 25, PageID 415, 417; Gurton Dep, Doc. 33-1, PageID 324-25). As Officer McGrath reached for Nathaniel from behind the ballistic shield he was holding in front of him for protection, Nathaniel retreated. (Doc. 38-1, ¶¶ 24, 25, PageID 415-417) Officer McGrath grabbed Nathaniel, pulled him forward and out through the doorway, forced him to the ground, and handcuffed him. (Id.) The object in Nathaniel's right hand turned out to be a vape pen. (Id.) It was only at that point that Allen Gurton, Sr., the subject of the arrest warrant, showed himself by coming downstairs fully dressed and wearing a coat and baseball cap. (Id., ¶ 27, PageID 418). He readily acknowledged he was the subject of an arrest warrant, turned around and put his hands behind his back, and let the officers take him into custody without further incident. (Id.)

In the process of taking Nathaniel to the ground to gain his compliance, Officer McGrath's ballistic shield scratched Nathaniel's head, causing two scratches that bled. (Gurton Dep., Doc.

33-1, PageID 296-98, 307-08; McGrath Dec., Doc. 38-1, ¶ 26, PageID 418). Treatment for the injury required two band-aids, provided at the scene by medical personnel. (Gurton Dep., Doc. 33-1, PageID 296-98, 307-08). Only Officer McGrath's shield made contact with Nathaniel's head. (Id., PageID 307-08). Nathaniel neither required nor sought any additional medical treatment beyond the two band-aids, either at the scene or at the Hamilton County Justice Center where he was transported, or at other any time. (Id., PageID 342-45). Nathaniel's arrest and transport to the Justice Center on the misdemeanor charge of obstructing official business arose from his conduct that Officer McGrath determined had delayed, hampered, and impeded the execution of the felony warrant for Nathaniel's father's arrest. (Doc. 38-1, ¶ 28, PageID 420; Doc. 38-4).

Nathaniel was upset and mad about the police presence that day in part because he had just gotten out of jail himself and had a job to get to that day. (Gurton Dep., Doc. 33-1, PageID 284, 301-02, 352). He was already in his work clothes when he was arrested that day. (Id., PageID 291-92). Other than the slight scratches requiring the two band-aids, he suffered, was diagnosed with, was treated for, no physical or mental injury arising from this incident. (Id., PageID 342-45, 360). When he got home from the Justice Center that night, his father apologized to him for the open arrest warrant that had resulted in not just his arrest but also Nathaniel's arrest. (Id., PageID 347).

Sergeant Asbury completed an Investigation Report reviewing the use of force against Nathaniel and his arrest on the misdemeanor charge of obstructing official business. (Asbury Dec., Doc. 39-1, ¶ 4, PageID 430-31; Doc. 39-2). He concluded the use of force was reasonable and the arrest was based on probable cause, and deemed both in compliance with department policy and with training, and that Officer McGrath's actions in that volatile, unpredictable situation were to be commended. (Id., ¶¶ 6, 10, PageID 431, 433). None of the individual defendants other than Sergeant Asbury and Officer McGrath were personally involved in directing the officers' actions

that day. (Id., ¶ 14, PageID 434; Doc. 38-1, ¶ 32, PageID 421).

Over three months later, Nathaniel's trial on the misdemeanor charge of obstructing official business was scheduled to be heard in municipal court. (McGrath Dec., Doc. 38-1, ¶¶ 33-35, PageID 421). However, Officer McGrath was called away to take part in a mandatory SWAT detail that same day. (Id.) Officer McGrath utilized the proper procedure for informing supervisory officers that he was unable to attend the proceeding, and he informed them early that morning before the courthouse opened. (Id.) The municipal court dismissed the charge for want of prosecution. (Id.)

Nathaniel complained vociferously about his injury and his arrest to the officers, expressing frustration that he would miss work that day at the nearby Dollar Store. (Gurton Dep., Doc. 33-1, PageID 257-261). Yet, after being released from the Hamilton County Justice Center later that same day, he never sought to regain employment there or anywhere else at any time. (Id.)

Nathaniel commenced this 42 U.S.C. § 1983 action against Officer McGrath, Sergeant Asbury, and the City of Cincinnati. (Doc. 2). He amended his complaint to add the reviewers of the Investigation Report that Sergeant Asbury completed. (Doc. 16). Plaintiff alleges the officers terrorized his family by arriving heavily armed with their faces concealed, forcing their way into their home, and screaming and cursing at them at gunpoint without telling them why they were there. He alleges an unreasonable search and seizure and excessive force that "was so extreme and outrageous as to go beyond all possible bounds of decency." (Counts I and VII). He also alleges malicious prosecution and abuse of process based on a "false and inaccurate description of the facts and circumstances leading to [his] arrest," resulting in, among other things, lost income. (Counts II and IV). He asserts the City has "a history" of failing to train, supervise, monitor, and discipline and a "practice of pursuing baseless criminal charges as a pretext to justify unlawful

6

assaults, battery, and detention of individuals." (Count III). Plaintiff also includes a "supervisory liability" claim against the individual "supervisory" defendants who "ratified" Officer McGrath's "illegal conduct" instead of undertaking a "meaningful investigation." (Count VIII). Finally, Plaintiff includes state law claims of battery, false imprisonment, and intentional infliction of emotional distress (Counts V, VI, and VII).

## III. <u>STANDARD OF REVIEW</u>

When a Rule 56 motion for summary judgment is made, the motion must be granted if the adverse party does not set forth specific facts showing that there is a genuine issue for trial. Civ. R. 56(E). This duty of the nonmoving party is one it "must" perform to avoid summary judgment. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978) ("Unsupported allegations in the pleadings do not suffice to necessitate the denial of a summary judgment."). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

## IV. <u>ARGUMENT</u>

The officers acted reasonably under clearly established law when they waited as long as they did after announcing themselves before they forcibly entered Plaintiff's father's home to serve a warrant for the father's arrest. After entering, they acted reasonably with respect to family members who impeded the lawful arrest. The officers are entitled to qualified immunity. Further, there is no evidence to support a municipal liability claim. Defendants are also entitled to immunity on the state law claims under the Political Subdivision Tort Liability Act, codified in Ohio Revised

Code Chapter 2744. Lastly, Plaintiff cannot meet the elements of an intentional infliction of extreme emotional distress claim. Defendants' Rule 56 motion should be granted in its entirety.

### A.  The individual defendants are entitled to qualified immunity as a matter of law.

The doctrine of qualified immunity provides that, in civil suits for monetary damages, government officials acting in their official capacity and performing discretionary functions are generally shielded from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McLaurin v. Morton*, 48 F.3d 944, 947 (6th Cir. 1995) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)). To overcome immunity, claimants must show (1) that officers violated their constitutional rights and (2) that the constitutional right at issue is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Flaskamp v. Dearborn Pub. Schs*, 385 F.3d 935, 940-41 (6th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). Plaintiff can satisfy neither prong.

### 1.  Officer McGrath and Sergeant Asbury acted reasonably in using force to enter the Gurtons' apartment.

The Fourth Amendment to the U.S. Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Under *Payton v. New York*, 445 U.S. 573 (1980), "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton* at 603. Under Ohio Revised Code Section R.C. 2935.12(A):

> When making an arrest or executing an arrest warrant . . . the peace officer, law enforcement officer, or other authorized individual making the arrest . . . may break down an outer or inner door or window of a dwelling house or other building, if, after notice of his intention to make the arrest or to execute the warrant or summons, he is refused admittance. . . .

Under *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995), the common-law knock and announce principle forms a part of the Fourth Amendment reasonableness inquiry. The Sixth Circuit has held that officers in some cases may satisfy the knock and announce requirement by identifying themselves as police even when they do not spell out their purpose in demanding entry. *Ingram v. City of Columbus*, 185 F.3d 579, 588, (6th Cir. 1999), citing *United States v. Finch*, 998 F.2d 349, 354 (6th Cir. 1993). As the Court put it in *Finch*,

> In our view, the identification of themselves as police and giving the occupants a reasonable time to respond are far more constitutionally significant than stating their purpose in demanding entry. . . .

*Finch* at 354.

Accordingly, the Court looks to whether "law enforcement announce[d] its presence and intent, giving the occupant a chance to comply and admit law enforcement officers before condoning the breaking of doors or windows." *See, e.g., Eldridge v. Warden, Chillicothe Corr. Inst.*, No. 1:16-cv-040, 2017 U.S. Dist. LEXIS 101163, *21 (S.D. Ohio Mar. 27, 2017), citing *State v. Gilbert*, 4th Dist. No. 06CA3055, 2007-Ohio-2717, at ¶ 23 (further citations omitted).

Here, the officers acted upon an open felony warrant for the arrest of Plaintiff's father who was home when they arrived. The officers knocked, responded immediately to Plaintiff's query asking who was there, and then all inquiry from within ended. Over two minutes passed without any further inquiry from within. That was more than enough time for Plaintiff to come to the door or simply to inquire further of the officers. *See United States v. Pinson*, 321 F.3d 558, 566, (6th Cir. 2003) (Noting the courts "have not established a minimum time that officers must wait" between announcement and entry, but noting "a wait of no more than fifteen seconds between announcement and entry may be sufficient when a drug search warrant is executed").

There is no minimum wait time that officers must adhere to. Rather, the Fourth Amendment

"dictates only that the officers' overall actions be reasonable, not that they wait a prescribed length of time before forcible entry." *Pinson* at 566, citing *United States v. Spikes*, 158 F.3d 913, 925-26 (6th Cir. 1998). The focus of the "knock and announce" rule "is properly not on what 'magic words' are spoken by police," or whether the police rang the doorbell, "but rather on how these words and other actions of the police will be perceived by the occupant." *Pinson* at 925. Determining the reasonableness of the interim between announcement and entry is a fact-specific inquiry that "mandates consideration of a number of factors, including the object of the search, possible defensive measures taken by residents of the dwelling to be searched, time of day, and method of announcement." *Id*. at 926-27.

Here, the object of the search, Plaintiff's father, was home. The officers arrived at a little after 8 o'clock in the morning, early enough to catch the subject of the warrant before he left to go about his business, but not so early that the occupants would have been in no condition to respond. If the fact that Plaintiff's father shared a first name with Plaintiff's brother caused Plaintiff to wonder which "Allen" the police were there, he did not evidence that because he did not ask. The subject of the warrant himself, Allen Gurton, Sr., expressed no surprise at the officers seeking his arrest—he knew exactly why the officers were there. (McGrath Dec. 38-1, ¶ 27, PageID 418).

It therefore was reasonable for the officers to suspect that Plaintiff's prolonged silence spelled something other than a readiness to comply with their lawful commands. Their investigation had indicated the presence of individuals within the residence with criminal arrest histories including arrests on weapons charges. (Id., ¶ 7, PageID 410). Two minutes was more than enough time for one or more of the occupants to take measures into their own hands—a fact that weighs firmly in favor of the officers' reasonableness at that point to gain entry by force. *See Spikes*, 158 F.3d at 926 (noting the officers had gathered information suggesting the occupants of

the target home were inclined to offer armed resistance and concluding that "[i]n such a danger-fraught situation, the officers may quite reasonably infer refusal more readily than under other circumstances."). Thus, Sergeant Asbury's raising of the side window and Officer McGrath's use of his foot to keep the door open and command the occupants to show their hands after Plaintiff's brother opened it were both reasonable. They are entitled to qualified immunity for those acts.

### 2. Officer McGrath acted reasonably in subduing Plaintiff physically.

Plaintiff's excessive force claim as it relates to Officer McGrath's use of "hard hands" on him is subject to the Fourth Amendment's "objective reasonableness" standard. *See, e.g., Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009); *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015); *Rucinski v. County of Oakland*, No. 15-1844, 2016 U.S. App. LEXIS 12619 (6th Cir. 2016). This is an objective test, to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The evaluation of reasonableness recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Officer McGrath had mere seconds, if that, to react and assess the situation inside the Gurtons' apartment once Plaintiff's older brother, Allen Jr., began to open the door. What he saw on the part of Plaintiff—hands not being raised in the air, a refusal to come to the door—compelled him to take quick measures to ensure his own safety and the safety of others. (McGrath Dec., Doc. 38-1, ¶¶ 18, 24, PageID 413, 415-16). His grabbing of Plaintiff's shirt and use of balance displacement to bring Plaintiff to the ground were a limited use of force under the circumstances. Plaintiff's clenching of an object in his hand at that moment needlessly invited a more serious and tragic application of force. *See, e.g., Mullins*, 805 F.3d at 767 ("We have previously held that

'[w]ithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed.'"), citing *Untalan v. City of Lorain*, 430 F.3d 312, 315-16 (6th Cir. 2005). Officer McGrath acted reasonably in neutralizing any threat Plaintiff's conduct posed without causing Plaintiff any injury beyond superficial cuts requiring two band-aids. He is entitled to qualified immunity with regard to his use of force against Plaintiff.

### 3. Officer McGrath and Sergeant Asbury acted reasonably in arresting Plaintiff for obstructing official business.

The Fourth Amendment guarantees the right to be free from arrest without probable cause. *Osberry v. Slusher*, 750 F. App'x 385, 392 (6th Cir. 2018). A probable cause determination requires looking at the "totality of the circumstances" known to the arresting officer at the time of the arrest. *Id*. (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016)).

Here, Officer McGrath was seeking to take Plaintiff's father into custody on the open arrest warrant. Because Plaintiff, unlike his brother, acted in a manner that delayed, endangered, and impeded the officers in their execution of the warrant, he was arrested for obstructing official business, in violation of Ohio Revised Code § 2921.31. The Sixth Circuit has explained probable cause to arrest for obstructing official business in Ohio as follows:

> Under Ohio law, obstructing official business requires: "(1) an act by the [arrestee]; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant so acts without privilege.

*Osberry*, 750 F. App'x at 393, citing *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016) (citing R.C. 2921.31). "[A]n affirmative act" is required on the offender's part. *Osberry* at 393. Further, short of "fighting words," probable cause cannot be based on [arrestee's] words alone. *Id*.

Here, Plaintiff ultimately did more than merely refuse to act. In contrast to his older brother,

Allen Jr., who eventually exited the apartment with his palms upturned to indicate his compliance with Officer McGrath's lawful commands to show his hands, Plaintiff—standing behind Allen Jr. and observing how his brother complied—continued to hold an object in his right hand while remaining inside the apartment and even retreated from Officer McGrath's grasp, making Officer McGrath have to resort to the use-of-force technique of balance displacement to physically remove Nathaniel from the area. (Doc. 33-1, PageID 324-25; Doc. 38-1, ¶¶ 24, 25, PageID 415-417). Plaintiff's affirmative acts supported probable cause to arrest Plaintiff. *See State v. Merz*, 12th Dist. No. CA97-05-108, 2000 Ohio App. LEXIS 3414, *7-8 (noting arrestee's refusal to comply with information requests and retreat back into house were affirmative acts).

Even if Officer McGrath lacked probable cause to arrest Plaintiff, he is entitled to qualified immunity for the arrest. "[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful." *Phillips v. Blair*, 786 F. App'x 519, 527 (6th Cir. 2019) (quoting *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011)). Plaintiff's continued physical defiance of Officer McGrath, causing Officer McGrath to divert his attention from possibly other sources of danger inside the apartment, made it reasonable for Officer McGrath to believe Plaintiff was obstructing the execution of the warrant. *See Merz* at 6-8. Furthermore, no clearly established precedent at the time put Officer McGrath on notice that this could potentially be seen as an unlawful arrest.

Because he cannot defeat the officers' qualified immunity, Plaintiff cannot move forward with his malicious prosecution and false arrest claims. In the Sixth Circuit, both claims are really claims for an "unreasonable prosecutorial seizure" governed by Fourth Amendment principles. *See Howse v. Hodous*, 953 F.3d 402, 408-409 (6th Cir. 2020) (citing *Spurlock v. Satterfield*, 167

F.3d 995, 1006, 1006 n.19 (6th Cir. 1999)); *see also Sykes v. Anderson*, 625 F.3d 294, 310 (6th Cir. 2010).

### 4. There is no supervisory liability.

As an initial matter, "[b]ecause vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "In a § 1983 suit or a Bivens action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer." *Id*. at 677 ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.") The *Ashcroft* Court rejected the view that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id*. at 678.

Here, even presuming a discriminatory purpose, an individual supervisory official's electronic signature on the Investigation Report weeks after the complained-of occurrences is insufficient to show anything more than mere knowledge. Plaintiff has not alleged what individual actions were taken by any individual defendant other than Officer McGrath and Sergeant Asbury did that would impose Section 1983 liability on that defendant. Defendants Jason T. Voelkerding, Stephen Saunders, Lisa Davis, and Eliot Isaac should be dismissed from this action.

### B. There is no evidence of a policy or practice that would demonstrate deliberate indifference to Plaintiff's constitutional rights.

A municipality is not vicariously liable for the unconstitutional actions of its employees or agents. *Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Dep't of Social Srvs. of City of New York*, 436 U.S. 658, 694 (1978)). A local government entity can only be held liable for a constitutional violation under § 1983 when that violation can be attributed to the enforcement of a local government policy, practice, or decision of a final local government

policy maker. *See Monell*, 436 U.S. at 694. "[M]unicipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *Pembaur* v. *Cincinnati*, 475 U.S. 469, 483-84 (1986).

To succeed on a claim for municipal liability, a plaintiff must satisfy the "rigorous standards of culpability and causation." *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010). Generally, the plaintiff must demonstrate that the municipality acted with deliberate indifference to the constitutional rights of the plaintiff. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005). *See also Connick v. Thompson*, 563 U.S. 51, 62 (2011). Deliberate indifference "does not mean a collection of sloppy, or even reckless, oversights." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996). The evidence must show that the need to act is so obvious that the [government's] 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to [the plaintiff's] constitutional rights. *Id.*

A plaintiff must also demonstrate that the official policy resulted in the violation of plaintiff's constitutional rights. *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007); *Gregory*, 220 F.3d at 441 ("For liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort."). Without a constitutional violation, there is no causation between the alleged unconstitutional policy and the harm to the plaintiff. *Id.*

In this case, there is no evidence of an unconstitutional policy or practice that would demonstrate deliberate indifference by the City to Plaintiff's constitutional rights. Plaintiff offers only conclusory allegations, not evidence of an unconstitutional practice of serving arrest warrants.

### 1. The City of Cincinnati did not fail to train or supervise.

A failure to train claim is when a municipality's culpability is "most tenuous." *Connick*, 563 U.S. at 61 (citing *Oklahoma City. v. Tuttle*, 471 U.S. 808, 822-23 (1985)). To state a § 1983

claim based on a failure to train, a plaintiff must prove:

> (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. We have further elaborated that, "[t]o show deliberate indifference, Plaintiff[s] must show prior instances of unconstitutional conduct demonstrating that the [city] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."

*Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (quoting *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

> Similarly, the elements of a failure-to-supervise claim are:

> (1) the existence of a clear and persistent pattern of abuse [by] governmental employees; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Grove v. Metro. Govt. of Nashville*, No. 3:18-cv-01270, 2019 U.S. Dist. LEXIS 89060, at *8 (M.D.Tenn. May 28, 2019) (quoting *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010)).

For a local government's failure to train to rise to the level of being considered an official policy, the decision must be deliberately indifferent to the rights of the person the employee may encounter. *Connick*, 563 U.S. at 61. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* Generally, to demonstrate deliberate indifference, a claimant must establish a pattern of similar violations that put the municipality on notice that existing policies were likely to cause injury. *Plinton*, 540 F.3d at 464 (citing *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Here, there is no evidence of a pattern of violation and the very minor injury to Plaintiff resulted from Plaintiff's own failure to raise his hands as commanded. Cincinnati police are trained in the use of force when the subject of an arrest warrant is home but ignoring the officers or

16

appearing to get ready to resist after the officers have announced themselves. (Asbury Dec., Doc. 39-1, ¶ 10, PageID 433). Officer McGrath was deemed in compliance by all reviewers and Plaintiff has not shown why they were wrong. Plaintiff has not shown that the City fails to train its officers on the relevant standards. The City is entitled to judgment as a matter of law.

### 2. The City of Cincinnati did not have a custom of tolerance.

To state a municipal-liability claim based on "an 'inaction theory,' where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched," the plaintiff must show: "(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's conduct was the 'moving factor' or direct causal link in the constitutional deprivation." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

In this case, Plaintiff points to no clear and persistent pattern of illegal activity, much less approval of unconstitutional conduct. The City is entitled to judgment as a matter of law.

### C. Defendants are entitled to immunity on all state law claims.

Ohio's Political Subdivision Tort Liability Act, codified in Ohio Revised Code Chapter 2744, governs when a political subdivision may be liable in tort. "As a general rule, political subdivisions and their employees are not liable for injury caused by any action of the subdivision or its employees in connection with a governmental function." *Woods v. Miamisburg City Schs*, 254 F.Supp.2d 868, 870 (S.D. Ohio 2003) (citing R.C. 2744.02(A)(1)). Municipal corporations are political subdivisions. *Id.* (citing R.C. 2744.01(F)). Absent one of the enumerated exceptions, political subdivisions and their employees are entitled to tort immunity when they are performing

a governmental function. *See Woods* at 879-81; *Culberson v. Doan,* 125 F.Supp.2d 252, 281-83 (S.D. Ohio 2000). For the different reasons described below, both the City and the individual defendants are immune here.

### 1. The City of Cincinnati is entitled to immunity under Ohio law.

The provision of police services is a governmental function. *Woods*, F.Supp.2d at 879 (citing R.C. 2744.01(C)(2)(a))). So is the enforcement of any law. R.C. 2744.01(C)(2)(i). Plaintiff thus must identify an exception to immunity to hold the City liable for any state law claim. There are five enumerated exceptions to the general grant of immunity for a political subdivision performing a governmental function, and they are set forth under R.C. 2744.02(B)(1)-(5)[2]. None of them apply to the facts of this case. Ohio courts have held political subdivisions are immune from claims of malicious prosecution, abuse of process, and intentional infliction of emotional distress because they are intentional torts. *Scott v. Giant Eagle, Inc.*, No. 1:12-cv-03074, 2013 U.S. Dist. LEXIS 63578, *19-20 (N.D. Ohio May 3, 2013), citing *Coleman v. Beachwood*, 2009-Ohio-5560 (Ohio Ct. App. Oct. 22, 2009) (further citations and quotations omitted). The City is entitled to immunity.

### 2. The Cincinnati Officers are entitled to tort immunity.

R.C. Chapter 2744 also immunizes individual defendants from liability. Generally, a plaintiff must show that the employee acted "manifestly outside the scope of [their] . . . official responsibilities," or "with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6). When a governmental function is being performed, an employee is entitled

---

[2] The exceptions under R.C. 2744.02(B)(1)-(5) are as follows: (1) Injuries caused by the negligent operation of a motor vehicle; (2) Injuries caused by the negligent performance of proprietary functions; (3) Injuries caused by the failure to keep open roads, highways and streets open, in repair and free from nuisance; (4) Injuries caused by negligence on the grounds of a building used for governmental purposes; or (5) Injuries for which liability expressly is imposed by the Ohio Revised Code." *Culberson*, 125 F. Supp.2d at 281.

to a presumption of immunity. *Johari v. City of Columbus Police Dept.*, 186 F.Supp.2d 821, 831 (S.D. Ohio 2002).

Therefore, even if Plaintiff could somehow demonstrate that the officers here lacked probable cause to arrest him for obstructing official business, that would not be sufficient to overcome immunity. *Johari,* 186 F.Supp.2d at 832. Plaintiff would also have to show that the officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner. *Id.* Malice is the willful design to cause injury to another. *Jones v. City of Norwood*, 1st Dist. No. C-120237, 2013-Ohio-350, ¶ 42. Bad faith constitutes a dishonest purpose or conscious wrongdoing with an ulterior motive or ill will. *Id*. Wanton misconduct is the failure to exercise any care toward those to whom a duty of care. *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 388, 2012-Ohio-5711, 983 N.E.2d 266 (2012). Reckless conduct requires "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*. "The actor must be conscious that his conduct will in all probability result in injury." *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, paragraph three of the syllabus. There must be a "perverse disregard of a known risk." *Id*. The record is devoid of facts suggesting such nefarious conduct on the officers' part.

The analysis as to the federal claims operates similarly for the officers on the state claims. Because Plaintiff cannot show the officers were objectively unreasonable, he cannot show facts that would deprive them of immunity on his state law claims. *See Chappell v. City of Cleveland*, 585 F.3d at 916 n. 3 (concluding that it must follow from a plaintiff's failure to show defendants' conduct was unreasonable that the plaintiff also failed to show Defendants acted with malicious purpose, in bad faith, or in a wanton or reckless manner). Accordingly, the officers are entitled to statutory immunity on Plaintiff's state law claims.

**D. There was no intentional infliction of emotional distress.**

To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show:

(1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) the actor's conduct was so extreme as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Martin v. City of Broadview Heights*, No. 1:08 CV 2165, 2011 U.S. Dist. LEXIS 92466, *52 (N.D. Ohio Aug. 18. 2011) (citations omitted). Because Ohio law narrowly defines this extreme conduct, a prima facie case is extremely difficult to show. *Id*. at 53.

The officers here did not fabricate the arrest warrant for Plaintiff's father. They did not set out to treat Plaintiff differently than his brother. They gave the occupants of the Gurton apartment ample time, after their presence as police officers became known, to inquire further into the officers' purpose. Plaintiff alleges he suffers anxiety as a result of his trying to exercise his "right to talk" to the police after they forcibly entered and issued commands at gunpoint. (Gurton Dep., Dec. 33-1, PageID 358-60). Unfortunately, because this case revolves around serving an arrest warrant at a suspect's home while the suspect was there, the right time for Plaintiff to exercise that "right to talk" was two minutes earlier when the officers were knocking, announcing "Police," and calling for "Allen" to come to the door. As unfortunate and upsetting as this incident was, the record here simply does not support an IIED claim.

## V. CONCLUSION

The Defendants' summary judgment motion should be granted. There are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

**EMILY SMART WOERNER (0089439)**
**CITY SOLICITOR**

*s/ Shuva J. Paul*
Shuva J. Paul (0088484)
Kevin M. Tidd (0080957)
Assistant City Solicitors
801 Plum Street, Suite 214
Cincinnati, Ohio 45202
Phone: (513) 352-4551
Email: shuva.paul@cincinnati-oh.gov
Email: kevin.tidd@cincinnati-oh.gov
*Trial counsel for Defendants*

*s/ Kimberly A. Rutowski*
Kimberly A. Rutowski (0076653)
LAZARUS LAW, LLC
The Huntington Center
525 Vine Street, Suite 2210
Cincinnati, Ohio 45202
Phone: (513) 721-7300
Email: krutowski@hllmlaw.com
*Special counsel for officers in their individual*
*capacity*

## CERTIFICATE OF SERVICE

I hereby certify that on August **2**, 2024 a true and accurate copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed to those parties who are not served via the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/ Shuva J. Paul*
Shuva J. Paul (0088484)