## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **NATHANIEL GURTON,** | : | **Case No.: 1:23cv65-JPH** |
| | : | |
| **Plaintiff,** | : | **Judge Jeffery P. Hopkins** |
| | : | |
| **v.** | : | |
| | : | **PLAINTIFF'S MEMORANDUM IN** |
| **CIAN McGRATH, et al.,** | : | **OPPOSITION TO DEFENDANTS'** |
| | : | **MOTION FOR SUMMARY** |
| **Defendants.** | : | **JUDGMENT (ECF #40)** |
| | : | **(ORAL ARGUMENT REQUESTED)** |

Plaintiff, Nathaniel Gurton furnishes this Memorandum in Opposition to Defendants' Motion for Summary Judgment. As set forth below, at minimum, there are genuine issues of material fact as to each of Plaintiff's claims; and therefore, Defendants' Motion should be denied.

Plaintiff requests that the Court hold oral argument on the Motion.

Respectfully submitted,

/s/ J. Robert Linneman
J. Robert Linneman (0073846)
H. Louis Sirkin (0024573)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, Ohio 45202
(513) 721-4450 (phone)
jrl@santen-hughes.com
*Attorneys for Plaintiff Nathaniel Gurton*

## Table of Contents

Page

Introduction…………………………………………………….…..…….1

I.  Factual Background…...………………………………………………..2

    A.  The events of January 26, 2022…………………………………...……..2

    B.  The CPD investigation of the use of force………....…………….…….......6

    C.  The Grand Jury declines to indict Allen, Sr……………………………….7

    D.  The case against Nathaniel is dismissed for lack of prosecution……………...8

    E.  Nathaniels Damages…………………………………………………...9

II.  Legal Argument………...……………………………………….………10

    A.  The Legal Standard under Fed. R. Civ. Proc. 56………………………...11

When reviewing a motion for summary judgment, a district court makes no credibility determinations and views all facts, inferences and evidence in a light most favorable to the nonmoving party.  *Clark v. Shop24 Global, LLC* 77 F. Supp.3d 660, 669 (2015); *Longaberger Co. v. Kolt*, 586 F.3d 459,465 (6th. Cir. 2009).

    B.  McGrath had no legal authority to arrest Gurton outside of the City's
       territorial border...……………………………………………………11

1389 W. Galbraith (location of the arrest) is not within the territorial limits of the City of Cincinnati.  (ECF#43-1)  It is located in the City of North College Hill.  Therefore, McGrath had no legal authority to make a warrantless misdemeanor arrest.  R.C. 2935.03; *Cincinnati v. Alexander*, 54 Ohio St. 2d 248, 248 (1978); *State v. Brown*, 143 Ohio St. 3d 444, 449 (2015).

    C.  Defendants are not entitled to summary judgment because they rely upon
       contested characterizations of the facts………………………………...…13

Throughout their Proposed Undisputed Facts and their Motion, Defendants present what they claim are quotations of statements allegedly made by a party, and interpretations of the facts based on the BWC video.  However, Defendants characterizations cannot be assumed to be accurate.  *Laplante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir., 2022) quoting *Scott v. Harris*, 550 U.S. 372 (2007).

**D. The Court should deny summary judgment on counts 1 and 2 because there is evidence from which a jury could find that Defendants violated Nathaniel's clearly established rights to be free of excessive force and arrest without probable cause**……………………………………………………………………………..15

There is abundant evidence supporting Nathaniel's Fourth Amendment claims and therefore the Court should deny the Motion on Counts 1 and 2.

**1. A police officer outside of their territorial jurisdiction does not have discretion to execute a warrantless misdemeanor arrest, and therefore cannot claim qualified immunity**………………………………………15

A police officer (or municipality) outside their jurisdiction does not have discretion to carry out a warrantless misdemeanor arrest. The officer has no authority at all to take such an action. Therefore, qualified immunity does not apply. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)

**2. Nathaniel's rights were clearly established**………………………………15

"[a] suspect has a clearly established constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him."*Coffey v. Carrol*, 933 F.3d 577, 589 (6th Cir., 2019); *Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1153 (6th Cir., 2022); *Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir.,2020) *Patrizi v. Huff*, 690 F.3d 459 (2012); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

**3. Defendant McGrath violated Nathaniel's right to be free from excessive force**…..………………………………………………………………………...16

The rule in this Circuit is clear. "[A] suspect has a "constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him." *Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1154 (6th Cir., 2022) ). Because McGrath struck Nathaniel when he was not resisting, there is no immunity.; *Wysong v. City of Heath*, 260 Fed. Appx. 848, 855 (6th Cir., 2008); *Smith v. Stoneburner*, 716 F. 3d 926 (6th Cir., 2013).

**4. Defendants McGrath and Asbury violated Nathaniel's right to be free from arrest without probable cause**………………………………………17

"Generally speaking, probable cause is present when the circumstances known to an officer support the belief that a criminal offense has occurred or is ongoing." *Jones v. City of Elyria*, *supra*, 947 F.3d at 914. Simply refusing to immediately obey commands does not contravene R.C. 2921.31. *State v. Crowell*, 189 Ohio App. 3d 468 (2nd Dist. 2010); *Patrizi v. Huff*, 690 F.3d 459 (2012); *State v. Sloan*, 2005-Ohio-5191, P16;*State v. Ellis*, 2020-Ohio-1115, P25 ;*State v. McIntosh*, 2024-Ohio-2979, P9; *Garfield Heights v. Simpson*, 82 Ohio App. 3d 286, 291 (8th Dist. 1992); *City of Parma v. Campbell*, 2001 Ohio App. LEXIS 4907, *9; R.C. 2921.31. The

facts alleged by Defendants to support the arrest could not constitute a criminal offense under Ohio law. They obviously lacked probable cause to arrest Nathaniel.

**5. The arrest warrant was invalid…………………………………...…………20**

The warrant was defective because it misidentified the suspect, or identified him inconsistently and insufficiently. The warrant failed to establish probable cause for the arrest to support forced entry into the Apartment, and a reasonable officer would have observed the defects.

**E. The court should deny summary judgment on Plaintiff's *Monell* and supervisory claims (Counts 3 and 8) because there are facts from which a jury could find that the City failed to adequately supervise and discipline McGrath and Asbury, and that it acquiesced in and ratified their wrongful conduct…………………..20**

This case presents a confluence of instances in which the City has 1) failed to enforce existing policies; 2) failed to supervise its officers as they are violating its policies; and 3) failed to discipline their officers for glaring violations. With their pretextual investigation of McGrath's conduct, the City has acquiesced in and ratified the conduct, thereby assuming liability. *Goodwin v. City of Painesville*, 2014 WL 11515373, *10-12, N.D. Oh No. 1:10 CV 02883 (January 13, 2014), *citing Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1990); *Monell v Dept. of Social Services*, 436 U.S. 658 (1978).

**F. The Defendants may not claim statutory immunity under Ohio Law for an unlawful arrest conducted outside the territorial boundaries of the City of Cincinnati…………………………………………………………………………..22**

The fact that this arrest took place outside the City's territorial boundaries entirely dispenses with the Defendants' claim of immunity. First, the City may not claim Municipal immunity under R.C. §2744.02 because such immunity applies only to governmental or proprietary functions. However, a Municipality's governmental acts are necessarily limited to its territorial boundaries and legal authority. Since a municipal police officer has no authority to conduct a misdemeanor warrantless arrest outside its jurisdiction, such an action could not constitute a government or proprietary action. ORC §2744.02; ORC §2744.03; *Rolen v. City of Cleveland*, 657 Fed. App'x. 353, 367-368 (6th Cir., 2016); *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir., 2018).

III. **Conclusion…………………………………………………………………...……….23**

<u>**MEMORANDUM IN OPPOSITION**</u>

**I.      Introduction**

In this case, the City of Cincinnati demonstrates its obstinate refusal to supervise and discipline its officers.   Nathaniel Gurton ("Nathaniel") was beaten and arrested because Defendant McGrath felt that Nathaniel, a bystander, didn't cooperate quickly enough in an arrest pursuant to a warrant that was successfully completed in less than four minutes.

Video footage shows Defendant McGrath cursing and beating Nathaniel in the face with a riot shield as Nathaniel attempted to comply with the contradictory and disorienting commands of two different officers who were holding him at gunpoint from opposite sides.   After McGrath realized that he had bloodied an innocent witness, McGrath and his supervisor, Defendant Asbury, contrived an offense to charge him with to cover the excessive force.   They proceeded to make a warrantless misdemeanor arrest even though they were outside of their territorial jurisdiction and without authority to do so.

McGrath then cavalierly skipped his trial appearance, costing time and money to the City, the Court, the Public Defender, and Nathaniel.   So the unfounded criminal charge was dismissed.

The City conducted an entirely pretextual investigation of Nathaniel's complaint of excessive force.   The City assigned Defendant Asbury, who was one of the arresting officers, to investigate his own misconduct.   Supervising CPD officers each in turn ratified the extraterritorial arrest, and the breach of investigatory procedure, and of course accepted Defendant Asbury's assessment that his own raid had been carried out impeccably.

Defendants have failed to show that they are entitled to judgment as a matter of law.   This Court should deny the Motion in total.

1

II.     **Factual Background**

A.     **The events of January 26, 2022**

On January 26, 2022, Nathanial was 21 years old and resided with his mother, father, and siblings, including his eight year old brother, at 1389 W. Galbraith Rd., Unit 18 in the City of North College Hill ("Apartment")(ECF#43-1)

At 8:16 that morning, Nathaniel was asleep in his bed when a group of six[1] Cincinnati Police Officers approached the Apartment. (ECF#33-1, PageID#264)  The Officers were dressed in plain clothes except for vests that bore a marking indicating that they were police.    All of them were heavily armed.  Some carried handguns, while others carried assault rifles, and others also carried batons, and shields.   It was then unknown to the Gurton family, but the officers had an arrest warrant for Nathaniel's father, Allen Gurton, Sr. ("Allen, Sr.")   Allen, Sr.'s other son, Allen Gurton, Jr. was also in the Apartment.  ("Allen, Jr.")

The Apartment is an end unit, so it has windows on three sides, and a back door. (ECF#43-12) The officers fanned out around the Apartment.  Three of the officers went to the rear and side, and three went to the front. The officers had obtained a master key to the Apartment so that they could enter without the need for force, but PO Knapp had forgotten to bring it on the mission.  (*See* BWC video: Knapp unredacted (CITY0066), at 01:55-02:08)[2]

With officers in position all around the apartment, one of them knocked on the front door. Nathanial responded: "who is it?"  One of the officers yelled back, stating that it was the police. The officer then stated, "Allen, it's the police.  Open the door or I'm going to kick it in. "    A

---

[1] McGrath and Asbury incorrectly claim that there were five officers present on the day of the incident.  BWC videos plainly show that there were six.  In ECF#43-12, two bodycam images taken at 08:16:53 at both the front and rear of the Apartment show four officers in view.  Adding the officers wearing the BWCs, this totals six.  Asbury also erroneously claims in his declaration that PO Knapp assisted him by holding drapes outside the window. But as can be seen in ECF#43-12, Knapp's BWC captures the sixth officer who is about to hold the drapes.

[2] References to videos manually filed by Defendants (ECF#37) will be identified with the bates number assigned by the Defendants (e.g. CITY0062) and officer name.  A table with the full file name of each video is appended hereto.

few seconds later, the officer stated, "Allen, you need to come to the door. You need to do it now and you need to let us know you're coming." (BWC; Jackson unredacted (CITY0064))

None of the officers stated that they had a search warrant or arrest warrant, nor that they were seeking to arrest Allen, Sr. But they did demand that "Allen" come to the door. But there was more than one "Allen" in the Apartment. No officer ever used Nathaniel's name or directed a command to Nathaniel specifically as they called from outside.

Nathaniel got out of bed and quickly dressed himself. (ECF#33-1, PageID#268, 276, 292) Nathaniel had no idea that there was a warrant out for his father's arrest. (*Id*., PageID#263) His father was also asleep in a different bedroom, and Allen, Jr. had been sleeping on the couch on the first floor. (*Id*., PageID#22, 249-50) Nathaniel's eight year old brother was also in the house. (*Id.*, PageID#267). Some time passed as Nathaniel woke his father so that Allen, Sr. could meet the police officers.

During this time, the officers at the rear and side attempted to force entry through other doors and windows. Defendant Asbury pried open a side window with a bar. (BWC video; Asbury unredacted (CITY0062) at 02:35) Closed blinds in the window obstructed any view through the window. He opened it, reached in, and tore apart the plastic blinds that hung inside the window. He then pulled the drapes out of the window. Officer Knapp attempted to kick in the back door, but the door held. (BWC video; Knapp unredacted (CITY0066) at 03:00)

Nathaniel got dressed, woke his father, and then made his way downstairs. His father was still upstairs, and Allen, Jr. was downstairs. (ECF#33-1, PageID# 267-68) At some point, he had picked up his vape pen. (*Id*., PageID#323-24) As he descended the stairs, he was confronted by Defendant Asbury who by then had opened the window and was pointing his handgun into the Apartment. (*Id*., PageID#265-66) Defendant Asbury shouted, "Go to the door

now or we're going to send the fucking dog!" and "open the fucking door or I'm sending the dog." (BWC video; Asbury unredacted (CITY0062) at 02:45)

Nathaniel and Allen, Jr. complied with Asbury's instructions. He told them to "Go to the door." As the two moved toward the door, Defendant Asbury instructed them "Keep your hands where I can see 'em." Thus, in order to avoid being shot or attacked by a dog, Nathanial and Allen, Jr. had to keep their hands visible to the man at the window, and they also had to open the front door. Defendant Asbury shouted to the officers in front, warning them that the boys were coming to the door. The front door had a sheet tucked over it, probably to block drafts in the January cold. Allen, Jr. negotiated the sheet and opened the door. (BWC video; Asbury unredacted (CITY0062) at 02:45 – 3:30) Throughout this time, the officers at the front door can be heard on Asburys BWC.

As this was happening, the officers in front had guns drawn and continued to shout orders at the closed door. (BWC video; Jackson unredacted (CITY0064) at 03:05). As Allen, Jr. slowly opened the door, Defendant McGrath forcefully kicked it open.

Nathaniel and Allen, Jr. then faced more guns with bright flashlights. Defendant McGrath screamed at them:

> Show me your fucking hands!
> Shut up, turn around, show me your fucking hands!
> (BWC video; Jackson unredacted (CITY0064) at 03:10)

The boys now had Asbury holding a gun behind them, who had instructed them to keep their hands where he could see them. But they now had to comply with a second group of officers in the opposite direction with McGrath cursing at them, and ordering them to: 1) turn around; and, 2) show their hands *in the other direction*. The boys literally could not simultaneously comply with all the commands that they'd been given. Nathaniel had been awake for less than three minutes and now stood in his living room with three guns on him from

two directions and a flashlight in his face.  He knew that if he moved too quickly or suddenly, he could be shot.  Nathaniel and Allen, Jr. moved slowly, and kept their hands visible.

Defendant McGrath ordered Allen, Jr. to step out.  Allen, Jr. exited cautiously.   After Allen, Jr. walked out, McGrath said "you, step out."  McGrath walked into the doorway toward Nathanial, obstructing Nathaniel's path.  Nathaniel complied, walking very slowly toward the doorway, holding his vape pen aloft so that it could be seen, with his other hand visible at his side.   Without warning, McGrath violently grabbed at Nathaniel's sweatshirt near his throat, then threw him to the ground, and hit him in the face with the shield.  When McGrath grabbed him, Nathaniel Gurton asked "What did I do?"  McGrath cursed as he assaulted Nathaniel:

> Get on the fucking ground!
> Get on the fucking ground!
> You think this is a fucking game?!!
> (BWC video; Jackson unredacted (CITY0064) at 03:30)

Nathaniel cried out in terror and confusion, but he still complied.  He voluntarily placed his hands behind his back while the officers handcuffed him.   Nathaniel still did not know what the police wanted.

With both boys handcuffed, Allen, Sr. surrendered voluntarily and was taken into custody without incident.  From the first knock on the door until Allen, Sr. was in handcuffs, the warrant was executed in just under four minutes.   (BWC video; Jackson unredacted (CITY0064) at 04:35)

However, after the assault, Nathaniel complained vociferously and asked to see a supervisor.  Defendant Asbury had come to the front and found Nathaniel with blood streaming down both sides of his face.  (BWC video; Asbury unredacted (CITY0062) at 04:30)  It didn't look good.  Asbury told Nathaniel that he was a supervisor, and took photos of his injuries. (ECF#43-2)  Asbury realized that Nathaniel needed an EMT. (BWC video; Asbury unredacted

(CITY0061) at 00:30 -01:30 ("Let's call fire.")  Faced with the prospect of discipline or a civil claim for excessive force, Asbury and McGrath decided that they would arrest Nathaniel and charge him with Obstructing Official Business, a second degree misdemeanor under R.C. 2921.31.

The events which comprised the alleged offense had all occurred in the City of North College Hill, outside the jurisdiction of the City of Cincinnati.  Nonetheless, McGrath and Asbury carried out the warrantless misdemeanor arrest, placed Nathaniel in a police car and he was taken to jail.  Nathaniel pleaded with the officers that he would lose his job, but they took no sympathy.

### B.    The CPD investigation of the use of force.

Asbury assured Nathaniel that an investigation would be conducted of his claim for excessive force by Defendant McGrath.  (BWC video; Asbury unredacted (CITY0063) at 04:10) However, Asbury did not provide nor fill out a CPD form 648 as required by CPD policy 15.100. (*See* ECF#43-3, PageID#481-82)

Under policy 15.100, citizen complaints of excessive force and improper seizures are required to be referred to the CPD Internal Investigations Section. ("IIS")(ECF#43-3, PageID#481)  However, Nathaniel's complaint was not referred.   Instead, Asbury was assigned to conduct the investigation.  (ECF#39-2, PageID#438-39).   Asbury had supervised and participated in the raid, and even used force on Nathaniel insofar as he drew his firearm on him. Assigning Asbury to act as the investigator directly violated policy 15.100, which provides:

> Any officer who used force or chemical spray during the incident, whose conduct led to the injury of a prisoner, or who authorized the conduct that led to these reportable incidents is prohibited from investigating the incident.   (ECF#43-3, PageID#480)

The "investigation" such as it was, consisted of Asbury interviewing Nathaniel while he was under arrest, and then interviewing McGrath, after having participated with McGrath in deciding

to arrest Nathaniel. (ECF#39-2, PageID#438-39) Asbury's role in conducting the interviews further violated policy 15.100:

> Any officer or supervisor involved in a situation resulting in an official compliant will not be present during any interview with the complainants or witnesses. (ECF#43-3, PageID#480)

In at least one respect, Asbury accurately reported the facts: he noted in the report that the arrest had taken place outside the City limits. (ECF#39-2, PageID#436)

Supervisory Defendants, Voelkerding, Saunders, Davis and Olverson in turn each found that the arrest and use of force had been in compliance with policy. None of them raised any question about Asbury investigating his own arrest and policy 15.100 was never mentioned. Neither did any of them note any jurisdictional issue with the extraterritorial arrest. The matter was concluded on February 22, 2022.

### C. The Grand Jury declines to indict Allen, Sr.

The Officers had sought the arrest of Allen, Sr. on a charge of robbery. However, when the Hamilton County prosecutor brought the charge before the grand jury, the charge was ignored. (ECF#43-4, PageID#490 (02/08/2022 IGNORED) Thus, the State was unable to prove probable cause that Allen, Sr. had committed the crime that had led to the beating and arrest of Nathaniel.

Also relevant here, the warrant itself was defective. The search warrant was based on an affidavit which identified the suspect inconsistently; once as "Allen Gurton, Sr." and once as "Allen Gurton." (ECF#43-4, PageID#493) In addition, the affidavit did not provide other identifying information such as date of birth, as required under Hamilton County's "Probable Cause Checklist, which was also filed in that case, and which also misidentified the suspect. (*Id*., PageID#492) Finally, the search warrant itself identified the suspect inconsistently: once as "Allen **B**urton", and once as Allen Gurton, Sr. (*Id*., PageID#495) The failure of the warrant to

consistently identify the suspect is particularly relevant here because there was a second Allen Gurton in the Apartment on the day of the arrest. A reasonable officer would have observed the facial inconsistencies in the warrant. The warrant was defective and failed to establish probable cause.

### D. The case against Nathaniel is dismissed for lack of prosecution

Nathaniel was represented by an Assistant Hamilton County Public Defender, who diligently prepared for trial in the case. The case remained pending for months while the defense attempted to obtain discovery from CPD. However, on the trial date, McGrath did not appear and the case was dismissed for lack of prosecution.

McGrath claims that he was excused from appearing because he "was called away to take part in a mandatory SWAT detail…and so I promptly informed supervising personnel…" (ECF#38-1, PageID#421) His claim is inaccurate. The so-described "mandatory SWAT detail" was McGrath's attendance at a police memorial, and a Cincinnati Reds game. (ECF#43-5)

McGrath had notice of the schedule conflict weeks before the trial. McGrath was first advised of the police memorial events via email on April 16, 2024. (ECF#43-6, PageID#497-48) McGrath responded the same day, advising of his availability. (*Id.*) McGrath received at least 4 written reminders about the event in the interim. (*Id.,* PageID#499-502) None of the emails states that attendance is mandatory; some of the emails explicitly state that the assignments are voluntary. (*Id.*)

The subpoena for McGrath's appearance was sent to him electronically on April 20 at 11:23 am for the trial on May 10 at 9 am. (ECF#43-7) Thus, McGrath had notice of the trial twenty days in advance. CPD's tracking indicates that the latest time that he viewed the subpoena was on May 4 at 10:11 am. (*Id.*) However, McGrath did not notify CPD personnel of his conflict until six days later, at 8:00 am on the morning of trial. (ECF#38-5). Because of the

late delivery, his request was not even processed by CPD until 10:00 am, an hour later than the scheduled trial time. (*Id*.)  Thus, when McGrath claims that he "promptly" informed supervising personnel, he means that he waited twenty days and informed a supervisor only an hour before the trial was to begin.

McGrath's conduct directly violated CPD policy 12.815.  (ECF#43-8)  That policy mandates that "Employees will appear for scheduled court cases in a timely and professional manner," (*Id.*, PageID#504).  CPD policy states that requests for continuances "will be considered," but only under certain circumstances. (*Id._* at PageID#511, C(1)(a)) An officer's request for a continuance must be made within 72 hours of the officer's receiving notice of the trial.  (*Id.*, PageID#511, §C(1)(b))  Thus, McGrath was required to request a continuance by April 23; 72 hours from his receipt of the subpoena.  McGrath clearly did not comply.   Despite the clear violation of policy, the scheduling supervisor covered for McGrath, marking his request "in compliance." (ECF#38-5)  McGrath's claim that he was properly excused for a mandatory event is false on both points.

### E.   Nathaniel's damages

Nathaniel suffered damages as a result of the wrongful conduct.  First, he was physically injured.  He suffered two deep cuts which left him bleeding from both sides of his head.  The amount of blood alarmed Defendant Asbury enough that he immediately documented Nathaniel's injuries with photos.  (ECF#43-2) Nathaniel remained handcuffed for hours and his mugshot shows that his face was still covered in blood when he was booked hours later. (*Id*.)

McGrath's assault exacerbated a pre-exising injury.  Nathanial had cataracts as a child and had repeated surgeries to repair them.  (ECF#33-1, PageID#285-6)  He has experienced a loss of vision since McGrath hit him.  (*Id.*)

Nathaniel suffered financial damages. Because he had been kept from work on the day that McGrath arrested him, he was fired from his job. (ECF#33-1, PageID#257-260) He had difficulty finding another job after being fired, in part because he had a pending criminal charge.

Nathaniel also suffered emotional distress from the assault. The trauma of the arrest affects him in his daily life. (ECF#33-1, PageID#353-4)

## III. Legal Argument

The Defendants have entirely misunderstood the Constitutional principles at stake in this case. Nathanial is not a defendant in a criminal case seeking to have evidence excluded based on an illegal search. Nathaniel was an innocent bystander in his home who was complying with police commands when he was seized, beaten, and arrested. It is no answer for Defendants to claim that an arrest warrant gave them authority to enter the Apartment. None of the cases cited by Defendants hold that an arrest warrant for one person confers upon a police officer the right to beat and arrest an innocent third party

This case does not turn solely on whether police had the right to forcefully enter. It also turns on Nathaniel's right to be free from excessive force and unlawful arrest. Even if Defendants could meet the legal standard to permit a forcible entry into the Apartment, this would not carry a privilege to assault and arrest an innocent third party who cooperated to facilitate an orderly arrest.

As a result of their misunderstanding of the issues, the Defendants turn the Fourth Amendment on its head. In Defendants' view, a citizen does not have the right to protection in the home; rather, the citizen has an obligation to quickly and forthrightly respond to and obey a police officer's demand that he open up his home to government intrusion. Defendants' view of the Fourth Amendment is terrifying, but fortunately it is not the law.

It would have been no crime for Nathaniel to have simply stayed in bed and done nothing while Defendants shouted for his father, uttered profanities, and pointed their guns at his family. So it was certainly no crime for him to help the police by waking up his father, facilitating his orderly arrest, and walking out of the house as instructed. The Defendants had no right to beat and arrest Nathaniel and they have offered nothing that excuses their conduct. Indeed, their conduct after the fact demonstrates their own awareness that they violated Nathaniel's clearly established rights.

### A. The legal standard under Fed. R. Civ. Proc. 56.

When reviewing a motion for summary judgment, a district court makes no credibility determinations and views all facts, inferences and evidence in a light most favorable to the nonmoving party. A court may only grant a motion for summary judgement if the moving party proves there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Clark v. Shop24 Global, LLC* 77 F. Supp.3d 660, 669 (2015); *Longaberger Co. v. Kolt*, 586 F.3d 459,465 (6th. Cir. 2009).

### B. McGrath had no legal authority to arrest Gurton outside of the City's territorial border.

1389 W. Galbraith is not within the territorial limits of the City of Cincinnati. (ECF#43-1) It is located in the City of North College Hill. Therefore, McGrath had no legal authority to make a warrantless misdemeanor arrest.

Under Ohio law, a police officer's authority to execute a warrantless arrest is provided by R.C. 2935.03, and is granted only within the limits of the municipality in which they are employed. Ohio's Supreme Court has interpreted this statute many times.

> The authority granted in R.C. 2935.03 to a police officer to 'arrest and detain a person found violating a law of this state' does not confer authority upon a municipal police officer to arrest without a warrant outside the geographical boundaries of his municipality for traffic offenses

11

observed by the officer to have been committed outside such municipal limits.

Cincinnati v. Alexander, 54 Ohio St. 2d 248, 248 (1978)

The rule set forth in Alexander has been recently affirmed by the Ohio Supreme Court.

[A]n arrest made in violation of a statute limiting the police officer's authority to make the arrest infringes on the right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures as guaranteed by Article I, Section 14 of the Ohio Constitution.

State v. Brown, 143 Ohio St. 3d 444, 449 (2015).

Defendants were admonished of this defect at the time of the arrest. CPD's incident report prompted McGrath and Asbury repeatedly to "VERIFY JURISDICTION." (ECF#43-9 PageID#519) When Defendants called for medical treatment for Nathaniel, it was the North College Hill Fire Department that responded, not Cincinnati. (ECF#43-10) Asbury noted this fact in his investigation report. See ECF#39-2, PageID#436 ("District: Outside City Limits") Yet, Defendants proceeded with the prosecution despite this knowledge, and without ever offering any legal theory to remedy the defect. They still have not done so in their MSJ (although they have conspicuously avoided mentioning the address of the premises in the Motion and both declarations).

The fact that the arrest was completely without authority affects every aspect of Nathaniel's claims. It deprives the Defendants of any right whatsoever to arrest him and assert criminal charges against him, it shows that the Supervisory Defendants failed to supervise and discipline McGrath, it relates to the reasonableness of the force used upon him, and it deprives all Defendants of any immunity.

12

**C.    Defendants are not entitled to summary judgment because they rely upon contested characterizations of the facts.**

Throughout their Proposed Undisputed Facts and their Motion, Defendants present what they claim are quotations of statements allegedly made by a party, and interpretations of the facts based on the BWC video.  However, Defendants characterizations cannot be assumed to be accurate.  The BWC video recordings of the incident provide the most reliable source in establishing many facts.  However, the video itself is not perfect.  Sound levels and quality do not permit definitive transcription of many statements.  Any determination about what was said requires interpretation of the sound, the intonation, delivery, and context.  In short, the videos present factual questions that can only be answered by a jury as finder of fact.

In the era of cell phone and BWC video, both the Sixth Circuit and the US Supreme Court have provided guidance as to how such evidence should be treated on motions for summary judgment.  Courts are instructed to "view any relevant gaps or uncertainties left by the videos in the light most favorable to the [non moving party], and must also make all reasonable inferences in their favor when undertaking the qualified immunity analysis on summary judgment."  *Laplante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir., 2022) quoting *Scott v. Harris*, 550 U.S. 372 (2007).  The presence here of conflicting or inconsistent descriptions, combined with the reliable video evidence means that under Rule 56, this case should not be decided on summary judgment.

At minimum, the parties present conflicting accounts of important factual matters.  The most obvious example is Defendant Asbury's claim that he saw Nathaniel and his brother standing by the front door and heard him tell his brother not to open the door.  (ECF#39-1, PageID#432-33)  Defendants take liberties with this allegation in their Motion, expanding Asbury's claim to say that Nathaniel and his brother stood there "during that two minute span." (Motion, ECF#40, PageID#445)  Yet, Nathaniel testified repeatedly that he had not done so.

(ECF#33-1, PageID#303, 313)  To the contrary, Nathaniel testified that when he first descended the stairs, before he got to the first floor, Asbury was already at the open window pointing a gun. (*Id*. PageID#265-66, 274-75)  Nathaniel never had time to make that statement or to lurk at the door because he was held at gunpoint as soon as he came down. (*Id.*)  Notably, Asbury has not identified a BWC recording that captured the alleged statement.  This is a critical issue of fact related to whether the officers had probable cause to arrest.

Defendants mischaracterize evidence on which the BWC shows an objective picture. Defendants claim that Nathaniel "failed to show his hands as ordered."  (Motion, ECF#40, PageID#446)  Yet, the BWC clearly shows that as he walked slowly toward the door, Nathaniel held his right hand aloft displaying his vape pen, while his other hand remained visible at his side.  (BWC video: Jackson unredacted (CITY0064) at 03:34)  Defendants claim that McGrath "used his foot to keep the door open" (ECF#40, PageID#453) despite the fact that the BWC clearly shows McGrath violently kicking the door open, not holding it open.  (BWC video, Jackson unredacted, (CITY0064) at 03:10)  Defendants simply cannot accept the facts objectively, much less in the light most favorable to Nathaniel.

Defendants only further muddy the waters with the declarations of McGrath and Asbury. (ECF#38-1, 39-1)  Defendants have identified no expert witness in this case, nor furnished any report.  They have instead styled themselves as experts, offering pages of their declarations in which they opine about such things as how law abiding citizens typically behave, and what it means to a police officer when a citizen doesn't answer the door after two minutes when they arrive at 8:00 am.  As noted elsewhere, there are other clear misstatements of fact or mischaracterizations in both declarations.  The Court should discount them.

Because Defendants' argument relies entirely upon their characterizations of disputed facts, summary judgment is inappropriate.

14

D. **The Court should deny summary judgment on Counts 1 and 2 because there is evidence from which a jury could find that Defendants violated Nathaniel's clearly established rights to be free of excessive force and arrest without probable cause.**

There is abundant evidence supporting Nathaniel's Fourth Amendment claims and therefore the Court should deny the Motion on Counts 1 and 2.

1. **A police officer outside of their territorial jurisdiction does not have discretion to execute a warrantless misdemeanor arrest, and therefore cannot claim qualified immunity.**

Qualified immunity applies to "government officials performing discretionary functions." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A police officer (or municipality) outside their jurisdiction does not have <u>discretion</u> to carry out a warrantless misdemeanor arrest. The officer has no authority at all to take such an action. Therefore qualified immunity does not apply.

The following arguments are offered in the alternative.

2. **Nathaniel's rights were clearly established.**

First, "[a] suspect has a clearly established constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him. *Coffey v. Carrol*, 933 F.3d 577, 589 (6th Cir., 2019); *see also Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1153 (6th Cir., 2022)("By September 2017, it was clearly established in this circuit that a person has a constitutional right to be free from injury-threatening physical force when he or she is not actively resisting the police.")

Next, "[e]qually well settled is one's right to freedom from arrest without probable cause. So too is the fact that, before one can be charged with violating Ohio's obstruction of official business statute, the suspect must commit an affirmative act of obstruction." *Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir.,2020); *see also Patrizi v. Huff*, 690 F.3d 459 (2012).

In addition, Nathaniel's rights have been established with sufficient specificity.

The contours of [a plaintiff's clearly established] right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right. ***This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.***

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)(***emphasis added***)

The Court has observed that "officials can still be on notice that their conduct violates established law *even in novel factual circumstances*." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)(*emphasis added*).

### 3. Defendant McGrath violated Nathaniel's right to be free from excessive force.

The rule in this Circuit is clear. "[A] suspect has a "constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him." *Moser, supra* at 1154. "[F]orce can easily be excessive if the suspect is compliant. There is no government interest in striking someone who is neither resisting nor trying to flee." *Wysong v. City of Heath*, 260 Fed. Appx. 848, 855 (6th Cir., 2008)( citations omitted)

In this case, the BWC video shows clearly that Nathaniel was not resisting when McGrath grasped him then tackled him. Nathanial was at gunpoint from two directions, walking forward out of the Apartment when McGrath stepped in front of him, obstructing his exit. McGrath then grabbed him, threw him to the ground, and struck him at least twice (once on each side of his head) with a combat shield. While Nathaniel was walking out of the house as instructed, he had the right to be free from assault by McGrath. At minimum, there is a genuine issue of fact as to whether the recoil of Nathaniel's body from McGrath's blow constitutes resistance.

The facts of this case are squarely on point with numerous other cases from the Sixth Circuit including *Moser, supra; Coffey, supra; Smith v. Stoneburner*, 716 F. 3d 926 (6th Cir., 2013). Because McGrath struck Nathaniel when he was not resisting, there is no immunity.

### 4. Defendants McGrath and Asbury violated Nathaniel's right to be free from arrest without probable cause.

Defendants McGrath and Asbury lacked probable cause to arrest Nathaniel for obstruction of official business. "Generally speaking, probable cause is present when the circumstances known to an officer support the belief that a criminal offense has occurred or is ongoing." *Jones v. City of Elyria*, *supra*, 947 F.3d at 914.

"To determine whether officers had probable cause to arrest an individual, we must look to the law of the jurisdiction at the time of the occurrence." *Patrizi*, *supra*, 690 F.3d at 464. Ohio law on this subject is very well developed. [3]

In *State v. Crowell*, 189 Ohio App. 3d 468 (2nd Dist. 2010), the court considered a prosecution for obstructing official business ("OOB") in which a defendant refused to respond when police investigating a 911 call summoned him to come from his house. The officers claimed that he had refused to obey their commands, and closed the open front door in order to prevent them from seeing or entering. The court found that this conduct did not violate R.C. §2921.31. In the specific context of a citizen refusing to obey police commands to come out of his house, the court found:

> [T]he charge of obstructing official business requires an affirmative act done purposely to hinder the police from performing their duties, and it is not merely a failure to respond to an officer's request. [Defendant's] initial refusal to come out of his home amounts to no more than a failure or refusal to respond to an officer's request; it does not constitute an affirmative act that could support a conviction for Obstructing Official Business.
>
> As to [defendant's] closing the front door of his home, while arguably an affirmative act under certain circumstances, here it amounted to no more than a continued refusal to cooperate with the officers. Even if it was an overt act, the State must prove not only the commission of an overt act

---

[3] In *Patrizi*, the Sixth Circuit relied upon a review of Ohio court of appeals cases in order to ascertain the state law on the subject. 690 F.3d at 465.

done with an intent to obstruct the officers, but it also must prove that the defendant succeeded in actually hampering or impeding them

*Crowell* at 471

The *Crowell* decision was not a groundbreaking interpretation of the statute in 2010, and that interpretation has not been altered by Ohio courts since. *See e.g. State v. Sloan*, 2005-Ohio-5191, P16 (refusing entry after initial consent to search was permissible and did not obstruct official business); *State v. Ellis*, 2020-Ohio-1115, P25 (refusal to obey an officer's request does not bring a defendant "within the ambit of this offense."); *State v. McIntosh*, 2024-Ohio-2979, P9 ("R.C. 2921.31 'criminalize[s] only affirmative acts, not the failure to act.'"); *Garfield Heights v. Simpson*, 82 Ohio App. 3d 286, 291 (8th Dist. 1992)( "[O]ne cannot obstruct official business by doing nothing."); *City of Parma v. Campbell*, 2001 Ohio App. LEXIS 4907, *9 ("[F]ailure to open the door upon request by the police does not constitute obstruction of official business.").

In this case, the defendants have relied upon similar claims of inaction or failure to act that have been rejected as grounds for an OOB conviction by Ohio courts. In his declaration, McGrath described the allegations as follows:

> Plaintiff's conduct, starting the moment he stopped communicating with us for over two minutes after asking "who is it?," and extending to his failure to follow his older brother out the front door as directed or to even show his hand to me despite my verbal commands, created an unnecessary additional risk that jeopardized his safety, my safety, the safety of the other officers, and the safety of third parties.
>
> ECF#38-1, PageID#420.

Defendant Asbury described the grounds for arrest as follows:

> Here, the fact that Plaintiff failed to respond for over two minutes to Officer McGrath's commands directed at "Allen"- after Officer McGrath responded to Plaintiff's question about who was knocking at the front door- jeopardized the safety of all present, especially given that I could see two males standing near the front door but not complying with or answering Officer McGrath's commands for "Allen" to come to the door. …

His obligation was to get out of the way of the police officers who were there for his father, not him.

ECF#39-1, PageID#433-34.

Defendants fault Nathaniel for the fact that he didn't call out, or ask questions and "indicate a willingness to communicate…" (Motion, ECF#40, PageID#445) They offer that Nathaniel stood behind the closed door and "ignore[ed] the officers commands to come to the door and show their hands." (*Id.*) The whole of the criminal charge is based on <u>inaction</u>.

Furthermore, the commands from outside the house were specifically directed to "Allen." The police called out repeatedly for Nathaneil's father, and Nathaniel knew that his father was on his way. There was no reason for Nathaiel to believe that the police even wanted him to come to the door. They wanted Allen. It was not even disobedience for Nathaniel to fail to open the door.

Defendants ultimately concede that Nethaniel actually did comply, but he just didn't comply fast enough for their liking. Defendants argue in their Motion that "this was not the time to refuse ***or to move at one's own pace***, as was the case here." (ECF#40, PageID#443)(***emphasis added)***

The facts alleged by Defendants to support the arrest could not constitute a criminal offense under Ohio law. They obviously lacked probable cause to arrest Nathaniel. Indeed, given these facts, Nathaniel is entitled to an inference by the Court that the reason that McGrath failed to appear at the trial is because he knew that the prosecution would be dismissed and he wished to avoid exposure of his misconduct.

In addition, even if Nathaniel had taken some affirmative act, the police were not delayed as a result. The entirety of the raid, from the first knock on the door until Allen, Sr. was handcuffed and in custody, took no more than four minutes.

Conveniently, Asbury and McGrath have provided proof that Asbury participated in and approved of the decision to arrest Nathaniel at the scene. (ECF#38-1, PageID#420, ¶31; ECF#39-1, PageID#434, ¶14. Thus, he is also a proper defendant under the claim for wrongful arrest.

There is abundant evidence from which a jury could conclude that McGrath and Asbury violated Nathaniel's clearly established right to be free of arrest without probable cause.

### 5. The arrest warrant was invalid.

The warrant itself was defective. The affidavit on which it was based identified the suspect inconsistently; once as "Allen Gurton, Sr." and once as "Allen Gurton." (ECF#43-4, PageID#493) The affidavit did not provide other identifying information such as date of birth, as required under Hamilton County's "Probable Cause Checklist, and the Checklist misidentified the suspect. (*Id*., PageID#492) The search warrant itself identified the suspect inconsistently: once as "Allen **B**urton", and once as Allen Gurton, Sr. (*Id*., PageID#495)

The failure of the warrant to consistently identify the suspect is particularly important here because there was a second Allen Gurton in the Apartment on the day of the arrest. A reasonable officer would have observed the facial inconsistencies in the warrant. The warrant was defective and failed to establish probable cause. The warrant therefore did not grant the officers any right or privilege to force entry into the Apartment.

### E. The Court should deny summary judgment on Plaintiff's *Monell* and supervisory claims (Counts 3 and 8) because there are facts from which a jury could find that the City failed to adequately supervise and discipline McGrath and Asbury, and that it acquiesced in and ratified their wrongful conduct.

In Count 3, Nathaniel has set forth allegations in support of claims for municipal liability against the City of Cincinnati as authorized by *Monell v Dept. of Social Services*, 436 U.S. 658

(1978). Under *Monell* and its progeny, a municipality may be held liable for the wrongful actions of its employees where the same arise from the official policies or customs of government.

However, acquiescence or ratification by a municipality of an officer's wrongful act provides grounds upon which municipal liability may be imposed. *See Goodwin v. City of Painesville*, 2014 WL 11515373, *10-12, N.D. Oh No. 1:10 CV 02883 (January 13, 2014), *citing Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1990). The Sixth Circuit has found that a municipality may ratify and become liable for such actions by failing to adequately investigate and punish officers responsible for violations of civil rights. *See Leach, Id*.

This case presents a confluence of instances in which the City has 1) failed to enforce existing policies; 2) failed to supervise its officers as they are violating its policies; and 3) failed to discipline their officers for glaring violations. With their pretextual investigation of McGrath's conduct, the City has acquiesced in and ratified the conduct, thereby assuming liability.

First, Asbury was ostensibly supervising McGrath. Yet, Asbury failed to recognize that neither of them had legal authority to make a warrantless misdemeanor arrest outside of their territorial jurisdiction.

Asbury recognized that there was at least prima facie evidence of excessive force when he saw Nathaniel bleeding. Yet, he disregarded the process provided for under CPD policy 15.100 to ensure independent review of citizen complaints of excessive force. He proceeded to act as the "investigator" of the incident, despite the fact that he was both a witness and a subject of the claim. When he issued his report, four different supervisory officers at four layers of management approved his conclusions without taking note that the arrest had been outside the jurisdiction, or that Asbury's acting as investigator was specifically prohibited under CPD

21

15.100.  This establishes that the management of CPD either is completely unaware of basic laws and policies, or is unwilling to enforce them.

CPD management also acquiesced and ratified McGrath's failure to appear at Nathaniel's trial.  McGrath had clearly failed to give adequate notice as required by CPD policy 12.815, and he did not take any action to give notice to the prosecutor or any other party.  Yet, the supervising officer covered for his breach by falsely claiming that his request had complied with procedure.

The City's failures to comply with its own policies constitute a ratification of McGrath's and Asbury's wrongful conduct for *Monell* purposes.  The City's disregard of policy 15.100 demonstrates deliberate indifference to need to provide independent review of citizen complaints of excessive force.  The City's investigation was inherently compromised and undertaken as a pretext to protect McGrath from a legitimate claim.  There is evidence of the City's failure to supervise and discipline its officers and its ratification of McGrath's violation of Nathaniel's rights for a jury to impose Monell liability.  This Court should deny Defendants' motion.

     **F.**    **The Defendants may not claim statutory immunity under Ohio Law for an unlawful arrest conducted outside the territorial boundaries of the City of Cincinnati.**

Nathaniel asserted several claims under state law, including malicious prosecution, abuse of process, battery, false imprisonment, and intentional infliction of emotional distress.  (Counts 4, 5, 6, and 7)("State Law Claims")  Defendants did not offer any argument for summary judgment for these claims on the merits, but instead asserted that they are entitled to immunity. Defendants' argument is not persuasive.

The fact that this arrest took place outside the City's territorial boundaries entirely dispenses with the Defendants' claim of immunity.  First, the City may not claim Municipal immunity under R.C. §2744.02 because such immunity applies only to governmental or

proprietary functions.  However, a Municipality's governmental acts are necessarily limited to its territorial boundaries and legal authority when so limited by statute.  Since a municipal police officer has no authority to conduct a misdemeanor warrantless arrest outside its jurisdiction, such an action could not constitute a government or proprietary action.  Or to the extent that it does, an officer's doing so would clearly be negligent, rendering it subject to the exception to immunity under R.C. §2744.02(B)(2).

The same limitation applies to the claim of immunity by the individual officers under R.C. §2744.03.  A warrantless misdemeanor arrest is necessarily outside the scope of the police officer's official responsibilities once they cross the territorial boundary and therefore exempted from immunity under R.C. §2744.03(A)(6)(a).  *See E.G. Rolen v. City of Cleveland*, 657 Fed. App'x. 353, 367-368 (6th Cir., 2016)  Similarly, an officer's carrying out such a lawless arrest would clearly be reckless, wanton, or constitute an act in bad faith which would subject their claim of immunity to an exception under R.C. §2744.03(A)(6)(b).

Separately, as a practical matter, the State Law Claims here will "stand or fall with their federal qualified immunity defense."  *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir., 2018). While the legal standard for statutory immunity is distinct, the facts that preclude summary judgment on Nathaniel's other claims also operate here to preclude summary judgment on the State Law Claims.

## III. Conclusion

The record in this case presents genuine issues of fact as to each of the causes of action set forth in the Amended Complaint.  Accordingly, Plaintiff requests that this Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

/s/ J. Robert Linneman
J. Robert Linneman (0073846)
H. Louis Sirkin (0024573)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, Ohio  45202
(513) 721-4450 (phone)
jrl@santen-hughes.com
*Attorneys for Plaintiff, Nathaniel Gurton*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification to the following:

Shuva J. Paul, Esq.                                    Kimberly A. Rutowski, Esq.

/s/ J. Robert Linneman
J. Robert Linneman

**APPENDIX OF BODY WORN CAMERA VIDEOS**
(Filed Manually [ECF #37])


      Asbury unredacted (CITY0062)
file name: CPD220126000247-ASBURY-22684-2022-01-26_0814_X6039A1SA (CITY 0062)

      Asbury unredacted (CITY0062)
file name: CPD220126000247-ASBURY-22684--01-26_0822_X6039A1SA (CITY 0061)

      (BWC video; Asbury unredacted (CITY0063)
file name: CPD220126000247-ASBURY-22684-2022-01-26_0830_X6039A1SA (CITY 0063)

      Jackson unredacted (CITY0064)
file name: 20547-2022-01-26_0814_X6039A1X5 (CITY 0064)

      Traufler unredacted (CITY0068)
file name: CPD220126000247-TRAUFLER-31202-2022-01-26_0813_X6039A1UJ (CITY 0068)

      Knapp unredacted (CITY0066)
file name (CPD220126000247-KNAPP-22694-2022-01-26_0814_X6039A1UD (CITY 0066))


696707.5